**HART METAL PRODUCTS CORPORA-
TION, Appellant,**

**v.**

**COMMISSIONER OF INTERNAL REV-
ENUE, Appellee.**

**No. 18172.**

United States Court of Appeals,
Seventh Circuit.

Jan. 29, 1971.

John L. Carey, Bruce R. Bancroft, Thornburg, McGill, Deahl Harman, Carey & Murray, South Bend, Ind., for appellant.

Johnnie M. Walters, Asst. Atty. Gen., Tax Division, Richard W. Perkins, Atty., U. S. Department of Justice, Washington, D. C., Lee A. Jackson, Thomas L. Stapleton, Robert I. Waxman, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before CASTLE, Senior Circuit Judge, CUMMINGS and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Taxpayer operated a profitable metal stamping business in Elkhart, Indiana,

from 1952 through 1957. When it discontinued operations in 1958, its sole shareholder also owned over 80 percent of the stock of Metal-Glass Company. In 1960 these Metal-Glass shares, together with all of taxpayer's outstanding stock, were sold to taxpayer's present owner. The principal issues presented for review arise out of transfers between taxpayer and Metal-Glass, the sale of shares of both corporations in 1960, and the fact that taxpayer qualifies as personal holding company as a result of the Commissioner's disallowance of a capital loss.

■ The Commissioner disallowed (1) a capital loss of $160,471.03 claimed to have resulted from taxpayer's disposition of some worthless Metal-Glass stock in 1961; (2) operating loss carryovers claimed after the 1960 sale and subsequent merger of taxpayer with a profitable company; and (3) deductions from undistributed personal holding company income of the Federal income tax liabilities for 1961, 1963, and 1964 assessed in this proceeding. The Tax Court held that all of taxpayer's claims were properly rejected by the Commissioner. We agree.[1]

## I.

Taxpayer claims to have suffered a capital loss of $160,471.03 as a result of its acquisition of a Metal-Glass promissory note in 1958 for a net cost of $106,771.11, its acquisition of 625 shares of Metal-Glass preferred stock in 1959 at a recorded cost of $53,700.92, the exchange of the note and preferred shares for Metal-Glass common stock in May of 1961, and the sale of that common stock for a price of $1.00 in September of 1961.

The Metal-Glass note and preferred shares were practically worthless when issued.[2] Taxpayer argues, however, that its basis is determined by the cost, rather than the value of the Metal-Glass paper, and that it exchanged assets having a value of $106,771.11 and $53,700.92, respectively, for the note and the preferred stock. We do not find petitioner's evidence persuasive; it falls far short of being sufficiently convincing to sustain taxpayer's burden of proof.

Taxpayer discontinued its manufacturing operations in March of 1958. In connection with the liquidation of its going business, it leased its entire plant, including all machinery and equipment in place, to Metal-Glass; sold Metal-Glass its truck and trailer line, including the right to the use of its name; and transferred its entire interest in various assets, including raw materials, work in process, finished goods, prepaid insurance, and deferred tool costs, to Metal-Glass.[3] In exchange, Metal-Glass exe-

1. We also reject taxpayer's argument that it was entitled to deduct $1,476.00 as "patent amortization" in 1961, 1963, and 1964 simply because the Commissioner had not challenged similar deductions in other years. See Dixon v. United States, 381 U.S. 68, 73–74, 85 S.Ct. 1301, 14 L. Ed.2d 223. Taxpayer's evidence vaguely identified one patent, but did not show, as required by the statute, that it owned any patents which were used in its business or held for the production of income. Int.Rev.Code of 1954, § 167.

2. Shortly after issuing the note, Metal-Glass filed a petition for reorganization under Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., alleging that it was unable to pay its debts as they matured. In that proceeding, the note payable to taxpayer was subordinated to the claims of general creditors who could not be paid even on a 66⅔ percent discounted basis. On its 1958 balance sheet, taxpayer carried a 100 percent reserve for uncollectability of the Metal-Glass note. The Metal-Glass preferred shares, which were issued after the reorganization was in progress, were even junior to the promissory note. The record adequately supports the conclusion that even if the Metal-Glass note and preferred stock had some nominal value, they certainly were not worth $160,471.13, or any amount approaching that figure, when respectively acquired by taxpayer.

3. Taxpayer's minutes of March 13, 1958, state in part:

"It was further reported that further consideration had been given to selling to Metal-Glass Products Company the

cuted a three-year lease at a monthly rental of $8,250.00, assumed various obligations (one of which was secured by the inventories), and issued its note for $109,653.98 to taxpayer.[4] The amount of the note was determined by subtracting the aggregate of the assumed liabilities from the aggregate book value of the transferred assets.[5] No part of the inventories or other assets was separately evaluated or specifically exchanged for the note. Taxpayer did not prove that its books fairly reflected the value of the entire bundle of transferred assets,[6] or of any identified portion of the bundle which could be fairly described as the "cost" of the note. In short, taxpayer failed to prove that the promissory note had either a value or a net cost of $106,771.11.[7]

The Metal-Glass preferred stock was also issued as part payment for the transfer of a bundle of assets. In March, 1959,[8] taxpayer transferred all of its machinery and equipment to Metal-Glass in exchange for the transferee's undertaking to assume a chattel mortgage indebtedness of $108,972.20, and, in addition, to issue the 625 shares of preferred stock. The preferred shares were recorded on taxpayer's books at $53,700.92, not by reason of any determination of the fair value of certain assets used to pay for those shares, but simply because that was the asset value remaining on taxpayer's books after deducting the amount of the assumed indebtedness.[9] Neither this transaction nor the earlier liquidation of inventories and various other assets was between parties dealing at arm's length.[10] Accordingly, the Tax Court was not

---

existing inventories of materials and work in process owned by this corporation, in addition to selling to said tenant the truck and trailer line now owned by this company, and that Metal-Glass Products Company would be willing to acquire same, provided that it could acquire, by lease, all of the plant facilities and real estate owned by this company."

The transferred assets were described orally by a witness who testified from certain records which apparently were not placed in evidence.

4. The book value of that note had been reduced to $106,771.11 in May of 1961 when it was exchanged for Metal-Glass common stock. The note itself is not in the record. Nor does the record explain how the amount of the obligation was reduced (since no provision for its payment was made in the reorganization proceedings), or whether or not it bore interest.

5. According to the testimony the assets were described as having a book value of $162,101.04 and the assumed liabilities amounted to $52,447.06.

6. One witness testified "these assets" were worth more than $109,000.00, but he had just summarized the book value of "these assets" at $162,101.04.

7. See note 4, *supra.*

8. As noted above, in March, 1958, taxpayer had leased its plant, including the

machinery and equipment in place, to Metal-Glass for a three-year period. Apparently the leased equipment was the subject of the 1959 sale, although this is not entirely clear because there is no indication that the rental was adjusted in 1959.

9. Taxpayer offered testimony that certain pieces of machinery at one time had substantial value, but the testimony did not clearly indicate that it related to the time of the transfer to Metal-Glass, or that the witness was not referring to items of Metal-Glass equipment which were intermingled with the equipment acquired from taxpayer. There was vague reference to an appraisal, but it was not offered in evidence. How useable the equipment was in 1959 is not made clear. In short, taxpayer's evidence as to the value of the transferred equipment in 1959 is anything but precise and persuasive.

10. Taxpayer argues that the approval of the sale of machinery and equipment by the Bankruptcy Court gave the transaction the *bona fides* of an arm's length sale. But there was no such approval of the issuance of the promissory note, and since neither the note nor the preferred stock could affect the interests of general creditors, the approval is not significant. At most, it might indicate that the court felt that the transferred assets were more valuable than some worthless paper; it certainly does not

required to accept the parties' valuation of the transferred assets or of the paper received in exchange. *Cf.*, G.U.R. Co. v. Commissioner, 117 F.2d 187 (7th Cir. 1941).

■ Since taxpayer failed to prove its claimed basis of $160,472.03, and since it made no attempt to prove an alternative basis for the stock which it sold for $1.00, the Tax Court was justified in sustaining the Commissioner's disallowance of the entire capital loss deduction. *Cf.*, Burnet v. Houston, 283 U.S. 223, 227–230, 51 S.Ct. 413, 75 L.Ed. 991.

### II.

On January 13, 1960, Monroe Coblens, a resident of Sarasota, Florida, who controlled profitable filter manufacturing operations in New Jersey, entered into a contract to acquire 100 percent of the stock of taxpayer and 80 percent of stock of Metal-Glass for a price of $13,-385.00, plus an undertaking to discharge certain Metal-Glass obligations.[11] Of the total purchase price, $13,185.00 was paid for the Metal-Glass shares and $200.00 was paid for the stock of taxpayer.

■ A year later, one of Coblens's profitable companies was merged into taxpayer. Taxpayer's attempt to apply its pre-acquisition losses against post-acquisition profits was disallowed by the Commissioner. The Tax Court sustained the disallowance, finding that Coblens's "principal purpose" in acquiring taxpayer was tax avoidance within the meaning of § 269(a) of the Internal Revenue Code.[12] This finding is amply supported by the record.

---

indicate that the court determined that either the paper or the transferred assets had the value ascribed by the parties.

11. "V. *Coblens Agrees.*

"A. That he will purchase all the shares of Hart stock issued and outstanding and owned by Barler and the one hundred sixty-six thousand, six hundred forty (166,640) shares of common capital stock of Metal-Glass owned by Barler, for the purchase price set forth in Section II above.

"B. That if the alteration proposed to the third amended arrangement is approved by the District Court for the Northern District of Indiana, he will, within sixty (60) days from said confirmation, make funds available to Metal-Glass to enable it to pay twenty-five and one-half cents (25½¢) on each original one dollar ($1.00) of general unsecured indebtedness under paragraph 4 of Article III of the Third Amendment Arrangement.

"C. That he will cause Metal-Glass, within thirty (30) days after closing, to reimburse Barler in the amount of Five Thousand, Five Hundred Dollars ($5,500.00) for money spent by Barler as agent for Metal-Glass.

"D. That he will cause Metal-Glass to pay, within thirty (30) days after closing, any accounts payable then due and owing from Metal-Glass to Barler.

"E. That he will cause Metal-Glass, within thirty (30) days after closing, to pay the Seven Thousand Dollars ($7,000.-00) management fee hereinafter set forth."

12. "SEC. 269. Acquisitions made to evade or avoid income tax.
   (a) In general.—If—
      (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or
      (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation,
   and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation." Int.Rev.Code of 1954, § 269 (a).

Coblens testified that he intended to bring his New Jersey operations to Indiana, merge them into the Metal-Glass operations, and have Metal-Glass personnel represent his filter company. Shortly after the acquisition, he further testified, he learned that Metal-Glass had been shipping inferior products, its name had been tarnished, and it had lost all of its best sales representatives. Accordingly, he abandoned his original operating plans.

This testimony does not convince us that the acquisition was primarily motivated by operating objectives. Prior to signing the purchase agreement Coblens did not thoroughly investigate the operating condition of Metal-Glass; he obtained no contractual warranties with respect to the condition of the assets or operations of either Metal-Glass or taxpayer; and his own operation of Metal-Glass was perfunctory.

On the other hand, his tax-saving motivation is plain. In the purchase agreement Coblens did obtain a warranty from the seller that it would not cause Metal-Glass or taxpayer to file a consolidated return with any other corporation, and, further, "that it has not taken nor will it take any action which has affected or may affect the rights of Metal-Glass and/or Hart to carry forward their respective net operating losses to the extent permitted by the Internal Revenue Code." The seller represented that no investigation or examination of any of

taxpayer's returns was pending or threatened. The subsequent merger of a profitable company into taxpayer, even though it was delayed for a year, is consistent with a tax avoidance motivation, particularly when the $200.00 purchase price for taxpayer's stock is contrasted with the substantially disproportionate tax benefits claimed.[13]    See Int.Rev. Code of 1954, § 269(c).

We are satisfied that the Tax Court correctly found that the principal purpose for which Coblens acquired taxpayer was to secure tax benefits that would not otherwise have been available.[14]

### III.

The corporation which Coblens merged into taxpayer in 1961 had been a personal holding company for several years. Taxpayer's claimed capital loss of $160,471.03 for 1961 had the effect of eliminating any income tax liability for the merged company in the year ending September 30, 1961, and, when carried forward, for the 1963 and 1964 fiscal years. Over 50 percent of taxpayer's income as reported was in the form of rent, and, therefore, the merged company did not file as a personal holding company. Respondent's disallowance of the claimed capital loss deduction increased taxpayer's total income, thereby reducing the rental income to less than 50 percent of the total and qualifying taxpayer as a personal holding company.[15]

Section 269(a) was amended by § 235 (c) (2) of the Revenue Act of 1964, P.L. 88–272, 78 Stat. 126, effective for taxable years *ending* after December 31, 1963. The amendment did not make a substantial change in the language of § 269(a) and, therefore, has no bearing on the issue decided here.

13. Of the net operating loss claimed for 1957, $50,088.58 was carried over and deducted in 1960, 1961, and 1962, to the extent of $15,932.59, $14,182.62, and $19,973.37, respectively; of the loss claimed for 1958, $10,967.27 and $18,705.04 were carried over and deducted in 1962 and 1963, respectively; the loss claimed for 1959, $37,581.66, was carried over and deducted in 1964.

14. The Commissioner has argued here that the disallowance of the capital loss deduction (see Part I, *supra*) is alternatively sustainable under § 269(a). He has taken the position that § 269(a) is applicable to certain "built-in" losses as well as losses in existence at the time of proscribed acquisition. In view of our agreement with the Tax Court's determination that the taxpayer failed to prove his capital loss claim, we do not reach this additional § 269(a) issue.

15. The Code, Int.Rev.Code of 1954, § 542 (a) (1), formerly defined a "personal holding company" as any corporation at least 80 percent of whose gross income for the taxable year was personal holding company income as defined in § 543. Rents

In calculating the tax on undistributed personal holding company income for 1961, 1963, and 1964, the Commissioner made no deduction for the income tax deficiencies assessed for those years since taxpayer had reported no income tax as due on its returns. Taxpayer contends that the income tax deficiencies assessed for 1961, 1963, and 1964 should have been deducted from its undistributed personal holding company income. The question presented is whether the Federal income tax liability for 1961, 1963, and 1964 which taxpayer is contesting in this proceeding "accrued during" those taxable years within the meaning of § 545(b) (1).[16]

■ A liability may not be taken as a deduction for Federal income tax purposes if it is contingent or if the obligation is in dispute. Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270. The liability accrues only in the year in which the obligation becomes fixed, and, if disputed, in the year in which the dispute is finally resolved. United States v. Consolidated Edison Co., 366 U.S. 380, 81 S.Ct. 1326, 6 L.Ed.2d 356.

Each of the cases in which this rule evolved arose out of two disputes, one with the party asserting the liability which the taxpayer claimed as a deduction, and the second with the Commissioner of Internal Revenue over the time when the deduction could properly be taken. In this case, however, both disputes are with the Commissioner. Federal income tax liability, rather than a state property tax, or some other liability to a third party, is claimed as a deduction for the purpose of computing the Federal tax on undistributed personal holding company income.

■ However, the rule that a disputed liability does not accrue until the dispute has been resolved has been clearly stated,[17] and we believe Congress intend-

---

constituted personal holding company income unless they amounted to 50 percent or more of gross income. Int.Rev.Code of 1954, § 543(a) (7). The result of Respondent's disallowance of the capital loss deduction was that, in each taxable year, taxpayer's rental income amounted to less than 50 percent of gross income and, therefore, qualified as personal holding company income, so that total personal holding company income exceeded 80 percent of taxpayer's gross income. The relevant provisions were amended by the Revenue Act of 1964, P.L. 88–272, § 225(b), (d), 78 Stat. 79, 81. The amendments were applicable for taxable years *beginning* after December 31, 1963. Thus, they are not relevant here.

16. "(b) Adjustments to taxable income.— For the purposes of subsection (a), the taxable income shall be adjusted as follows :·

(1) Taxes.—There shall be allowed as a deduction Federal income and excess profits taxes (other than the excess profits tax imposed by subchapter E of chapter 2 of the Internal Revenue Code of 1939 for taxable years beginning after December 31, 1940) and income, war profits and excess profits taxes of foreign countries and possessions of the United States (to the extent not allowable as a deduction under section 164(b) (6)), accrued during the taxable year, but not including the accumulating earnings tax imposed by section 531, the personal holding company tax imposed by section 541, or the taxes imposed by corresponding sections of a prior income tax law. A taxpayer which, for each taxable year in which it was subject to the tax imposed by section 500 of the Internal Revenue Code of 1939, deducted Federal income and excess profits taxes when paid for the purpose of computing subchapter A net income under such Code, shall deduct taxes under this paragraph when paid, unless the taxpayer elects, in its return for a taxable year ending after June 30, 1954, to deduct the taxes described in this paragraph when accrued. Such an election shall be irrevocable and shall apply to the taxable year for which the election is made and to all subsequent taxable years." Int.Rev.Code of 1954, § 545(b) (1).

17. The applicable regulation in pertinent part provides :

"In computing the amount of taxes accrued, an unpaid tax which is being contested is not considered accrued until the contest is resolved." Treas.Reg. § 1.545–2(a) (1) (i) (1954).

ed it to apply to a case such as this. The explanation of § 545(b) (1) contained in the House Report on the bill which became the Revenue Act of 1954 contains a statement that covers this case:

> "In the case of contested taxes the accrual occurs in the year the contest is resolved (Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270)." H.R.Rep. No. 1337, 83rd Cong., 2nd Sess. A177, U. S.Code Cong. & Admin.News 1954, p. 4316.

The Senate Report contains a comparable statement. S.Rep. No. 1622, 83rd Cong., 2nd Sess. 320. The citation of Dixie Pine Products Co. v. Commissioner, in the committee reports indicates, we think, that the test for determining when the income tax liability "accrued" for purposes of deductibility from undistributed personal holding company income is the same as that used in determining the date of accrual of a liability to a state taxing body. We, therefore, agree with the Tax Court that the Federal income tax liability being contested by a taxpayer may not be claimed as a deduction, and is not "accrued" under § 545(b), until the contest is resolved.[18]

The judgment is affirmed.

---

18. In its reply brief taxpayer advanced the argument that failure to allow this deduction may produce a confiscatory result, since the sum of the Federal income tax deficiency and the personal holding company tax deficiency will exceed 100 percent of the total taxable income attributable to the years in question. However, the Commissioner contends that § 547 of the Code permits the taxpayer to avoid this result by electing, subsequent to a final determination of its personal holding company tax liability, to make a dividend distribution and thereby avoid the personal holding company tax deficiency. Int.Rev. Code of 1954, § 547; Treas.Regs. §§ 1.- 547–1 to 1.547–7 (1954). Taxpayer conceded that § 547 relief was available to it at oral argument.

Moreover, the anticipated tax consequences of postponing deductibility until a dispute is resolved is merely one of the factors which a taxpayer must be assumed to have considered before deciding to dispute a claim (whether asserted by the Commissioner or anyone else). The administration of the tax laws would be severely compromised if an exception from a rule fairly stated by Congress had to be created to eliminate hardship caused by the failure of a tax avoidance plan. We, therefore, assume that § 547 relief provided by Congress adequately protects taxpayer from the consequences of its decision to dispute the income tax deficiencies assessed by Respondent.