448

MARIANI FROZEN FOODS, INC., SUCCESSOR IN INTEREST TO INTERNATIONAL FOOD TECHNOLOGY SERVICE, INC., ET AL.,[1] PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 11129–78, 13826–79,        Filed September 21, 1983.
13827–79, 13828–79,
13829–79, 13830–79.

---

[1]Cases of the following petitioners are consolidated herewith: Melinda L. Gee Trust, Robert E. Gee and Kathleen L. Gee, Trustees, Transferee of L.F.G., Inc., docket No. 13826–79; Kathleen E. Gee Trust, Robert E. Gee and Kathleen L. Gee, Trustees, Transferee of L.F.G., Inc., docket No. 13827–79; Joel-Ann Foote, Transferee of L.F.G., Inc., docket No. 13828–79; Robert E. Gee, Transferee of L.F.G., Inc., docket No. 13829–79; and Kathleen L. Gee, Transferee of L.F.G., Inc., docket No. 13830–79.

*Jay R. Oliff*, for the petitioners.
*Robert W. Towler*, for the respondent.

FORRESTER, *Judge*: Respondent determined deficiencies and/or liabilities in petitioners' Federal income taxes as follows:

| Docket No. | Petitioners | Year ending | Deficiency or liability |
|---|---|---|---|
| 11129–78 | Mariani Frozen Foods, Inc., successor in interest to International Food Technology Service, Inc. | 4/30/74 | $1,217,489.00 |
| 13826–79 | Melinda L. Gee Trust, Robert E. Gee and Kathleen L. Gee, Trustee, Transferee of L.F.G., Inc. | 4/30/74 1/3/75 | 30,374.23 |

| 13827–79 | Kathleen E. Gee Trust, Robert E. Gee and Kathleen L. Gee, Trustees, Transferee of L.F.G., Inc. | 4/30/74 1/3/75 | $30,374.23 |
| 13828–79 | Joel-Ann Foote, Transferee of L.F.G., Inc. | 4/30/74 1/3/75 | 643,213.00 |
| 13829–79 | Robert E. Gee, Transferee of L.F.G., Inc. | 4/30/74 1/3/75 | 428,808.00 |
| 13830–79 | Kathleen L. Gee, Transferee of L.F.G., Inc. | 4/30/74 1/3/75 | 582,465.34 |

Prior to January 1974, International Food Technology Service, Inc. (hereinafter IFTS), and L.F.G., Inc. (hereinafter LFG), were shareholders in Simarloo Pty., Ltd. (hereinafter Simarloo), an Australian corporation organized under the laws of the State of South Australia.

After concessions by the parties, the following issues remain for our decision:

(1) Was Simarloo a foreign personal holding company for its fiscal year ended June 30, 1973;[2]

(2) Do section 551(b)[3] constructive dividends includable in gross income by LFG and IFTS qualify as dividends within the intendment of section 543(a)(1);

(3) Are corporate tax liabilities attributable to amounts includable in gross income pursuant to section 551(b) by LFG and IFTS in their taxable years beginning May 1, 1973, properly deductible in calculating their undistributed personal holding company income;

(4) Does the merger of IFTS into Mariani Frozen Foods, Inc. (hereinafter MFF), qualify as a section 368(a)(1)(F) reorganization so that, pursuant to section 381(b), net operating losses of MFF's may be carried back to offset IFTS's income for its taxable year beginning May 1, 1973;

---

[2]Resolution of this issue turns on our disposition of the following subsidiary issues: (a) Did LFG and IFTS own more than 50 percent in value of Simarloo's outstanding shares; (b) Did certain foreign currency exchange gain of Simarloo's qualify as gain from the sale of stock for purposes of sec. 553(a)(2), I.R.C. 1954; (c) Was Simarloo's gain on the sale of certain stock ordinary income under *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955); (d) Does the doctrine of *Alvord v. Commissioner*, 277 F.2d 713 (4th Cir. 1960), apply to Simarloo on the facts of this case.

[3]All statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise specified, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(5) May IFTS increase its basis in its Simarloo shares pursuant to section 551(e) for purposes of calculating its dividends paid deduction under section 562;

(6) Is respondent barred by the statute of limitations from assessing liabilities against the transferees of LFG. We need reach issues (2) through (6) only if we find that Simarloo was a foreign personal holding company.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner MFF was a California corporation with its principal office in Cupertino, Calif., when its petition in this case was filed.

On December 4, 1973, IFTS distributed its assets to MFF in complete liquidation. The deficiency in docket No. 11129-79 relates to IFTS's taxable year beginning May 1, 1973, and ending on December 3, 1973.

Robert E. Gee and Kathleen L. Gee resided in Los Altos, Calif., when their petitions in this case were filed. Robert E. and Kathleen L. Gee were trustees for the Melinda L. Gee and Kathleen E. Gee trusts when those trusts filed petitions in this case. Joel-Ann Foote resided in Santa Cruz, Calif., at the time of filing her petition in this case. Respondent asserts liabilities in docket Nos. 13826-79, 13827-79, 13828-79, 13829-79, and 13830-79, against the aforementioned individuals and trusts on the theory that each is liable as a transferee of LFG for alleged deficiencies in LFG's taxable year ended April 30, 1974, and short taxable year ended January 3, 1975.

### Simarloo

Simarloo was incorporated under the laws of South Australia in 1964. During 1968–74, the period material to this case, Simarloo engaged in the business of developing fruit orchards and producing and marketing fruit and other produce.

In mid-1968, Simarloo had 1,000 shares of stock outstanding, held as follows:

| | |
|---|---|
| Paul A. Mariani, Jr. (hereinafter Mariani) | 499 shares |
| W. Matthew Looney (hereinafter Looney) | 375 shares |
| Robert E. Gee (hereinafter Gee) | 125 shares |
| James Trowbridge | 1 share |

Sometime in 1968 Mariani, on behalf of Simarloo, began negotiating with the Dairy Farm Ice & Cold Storage Co., Ltd. (hereafter Dairy Farm), a Hong Kong corporation, for the sale to Dairy Farm of a minority interest in Simarloo. Dairy Farm was a large, publicly traded Hong Kong corporation that owned and operated retail stores that offered an outlet for Simarloo's produce.

Simarloo's motive for seeking to induce Dairy Farm to become a shareholder was to acquire additional funds for development, primarily through loans from Dairy Farm, and to assure itself of a market for its agricultural produce.

In 1968, pursuant to its negotiations with Simarloo, Dairy Farm requested an appraisal of Simarloo's assets. As a result of that appraisal, which revealed a substantial increase over book value of Simarloo's assets, an asset revaluation reserve of $A654,368 was created. Dairy Farm relied upon this appraisal in its negotiations with Simarloo shareholders. Because Simarloo was in a developmental stage and did not expect to market significant amounts of produce for some time, Dairy Farm's negotiations with Simarloo were predicated on the assumption that Simarloo would not distribute any dividends for 10 years.

On December 13, 1968, Simarloo executed an agreement with Dairy Farm and Asian Food Industries, Ltd. (hereinafter AFIL), a Dairy Farm affiliate. In accordance with this agreement, (a) Mariani, Looney, and Gee increased their loans to Simarloo to $A200,000; (b) Mariani, Looney, and Gee bought 26,472 preference shares at $A2 per share, and Simarloo used the proceeds to pay off a loan from Paul A. Mariani Enterprises, Inc.; (c) the aforementioned 26,472 preference shares were reclassified, 5,348 as class A preference shares, and 21,388 as class M preference shares; (d) Mariani, Looney, and Gee sold the 5,348 class A preference shares, representing 20 percent of all outstanding preference shares, to AFIL at $A2 per share; (e) AFIL purchased 250 class A ordinary shares, representing 20 percent of outstanding ordinary shares, from

Simarloo for $A114,305; (f) Simarloo purchased 44,060 ordinary shares of AFIL at $A1 per share; (g) Simarloo purchased 16,655 shares of Dairy Farm at HK$35 per share, or approximately $A83,275.

Following the aforementioned transactions, AFIL held 20 percent of Simarloo's outstanding shares and Simarloo held 18.75 percent of AFIL's outstanding shares and 2.33 percent of Dairy Farm's outstanding shares. AFIL's relative interest in Simarloo remained unchanged through Simarloo's year ended June 30, 1973.

Also on December 13, 1968, another agreement between Mariani, Looney, Gee, Simarloo, and AFIL was executed under which AFIL agreed to lend Simarloo $A300,000 subject to certain conditions. Mariani, Looney, and Gee agreed that their loans to Simarloo would rank equally with AFIL's loan and that, if security was given to either, equal security would be given to the other.

At the dates shown below, the balance of loans outstanding from AFIL to Simarloo were:

| Date | Balance of loans outstanding |
|------|------------------------------|
| 6/30/69 | $A150,000 |
| 6/30/70 | 250,000 |
| 6/30/71 | 300,000 |
| 6/30/72 | 300,000 |
| 6/30/73 | 1,414 |

A debenture dated January 13, 1969, secured the advances of the U.S. shareholders and AFIL. This debenture provided for interest at 7½ percent per annum. Interest was to accrue from the date of advance, but no interest was to be paid for 7 years from the date of the debenture. The debenture dated January 13, 1969, was replaced by another debenture dated April 9, 1970, securing the advances of the U.S. shareholders and AFIL. The April 9, 1970, debenture created a second charge against all Simarloo's assets other than property in which the U.S. shareholders and AFIL had a specific security interest. The interest rate remained 7½ percent.

Simarloo's Memorandum of Association and Articles of Incorporation, as amended pursuant to the December 13, 1968, agreement between Simarloo and Dairy Farm, include the following provisions applicable to its year ended June 30, 1973:

The holders of the M shares (Mariani, Looney, and Gee) may elect five directors; the holders of the A shares may elect one director.[4] Directors elected by a particular class of shares may only be removed or replaced by that same class of shares. Unless otherwise determined by the directors at a duly convened meeting with a quorum present, a quorum shall consist of three directors, and must include the A director. The M shares represent 80 percent of the shareholder voting power, except that the M shares have only 74 percent of the total vote on special resolutions. Special resolutions must be passed by a majority of not less than 75 percent, and are required, inter alia, for a voluntary liquidation of Simarloo, and for amending the Articles of Association, but not for declaration of a dividend. Dividends cannot exceed the amount recommended by the directors.[5]

Regulation eight of the Australian Banking Act of 1959, in effect during the taxable year in issue, provided that except with permission of the Reserve Bank, Australian corporations could not pay dividends to shareholders resident outside of Australia. Reserve Bank authority to make such payments was not withheld except in extraordinary circumstances.

In the years 1968-74 Simarloo developed orchards on its land, an undertaking that required large amounts of capital. Since Simarloo's orchards produced little prior to the 1971-72 harvest season,[6] it was necessary for Simarloo to acquire funds from other sources. In addition to the loans from the U.S. shareholders and Dairy Farm, in 1970 Simarloo obtained a line of credit of $A800,000, with $A530,000 the maximum outstanding at any time, from the State Bank of South Australia (hereinafter the State Bank). Simarloo was limited to borrowings of $A100,000 per year or less under this agreement. The following table shows Simarloo's outstanding indebtedness to the State Bank on various dates:

---

[4]During its 1972-73 year, Simarloo had five directors, four elected by the M shareholders and one by the A shareholders.

[5]Simarloo's directors recommended that no dividends be declared for the year ended June 30, 1973.

[6]The Australian harvest season extended from December to February.

| Date | | Balance of loans outstanding |
|------|---|------------------------------|
| 6/30/70 | ...................... | $A75,000 |
| 6/30/71 | ...................... | 200,000 |
| 6/30/72 | ...................... | 250,000 |
| 6/30/73 | ...................... | 300,000 |

Simarloo applied to the State Bank for additional $A100,000 loans in 1970 and 1971, but these applications were not approved.

Simarloo's obligation to the State Bank was secured by a mortgage on all of Simarloo's assets; additionally, the entire balance of the loans was to become due and payable if, inter alia, the further prosecution of Simarloo's business threatened the State Bank's security.

The State Bank's letter approving Simarloo's request for a line of credit stated that: "During the term of * * * loan the Bank would require the Company to refrain from making cash payments of dividends or repayment to Shareholders of Capital or loan monies."[7] No such condition appeared in the actual loan agreements.

Simarloo harvested its first commercially marketable fruit crop in 1971-72, and its 1972-73 harvest was larger than the preceding year's. Simarloo experienced some difficulty in marketing these harvests, however. Simarloo could not market its produce directly without securing an export packing license from the Australian Dried Fruits Association. Simarloo failed to secure such a license, and thus found it necessary to market its produce through entities that did have the requisite license.

Mariani and Looney differed on how best to market Simarloo's 1971-72 and 1972-73 harvests. Mariani believed that Simarloo's produce should be marketed through Angus Park, an entity owned by Mariani. Looney disagreed, and argued for various alternative marketing approaches. As a result of this disagreement between Mariani and Looney, Mariani resigned his position as Simarloo's managing director on November 7, 1971, and was replaced by Looney. Friction continued, however, and led to Looney's resignation as managing director on

---

[7] In 1973, Simarloo repaid shareholder loans of over $A500,000 with no adverse reaction from the State Bank.

January 24, 1973. On that date, Looney was replaced as managing director by Philip Oram (hereinafter Oram), the class A director.

The income from the 1971-72 and 1972-73 harvests was not enough to solve Simarloo's financing problems.

In September 1971, to raise funds needed for operating its business, Simarloo sold 13,310 shares of Dairy Farm stock for $A157,238, at a profit of $A123,706.

By memorandum of December 28, 1971, Oram proposed to the other directors, Mariani, Looney, and Gee, alternative plans for obtaining funds for additional development, including a loan arrangement with a large international bank. The prospective lender was said to be willing to advance Simarloo up to $A600,000 to be secured by a first charge over 20,000 Dairy Farm shares, a second mortgage debenture over remaining assets, and a Dairy Farm guarantee of the loan. The lender also required that Simarloo's capital structure be revised so that AFIL's shareholdings be increased to 33⅓ percent (with an option to increase to 40 percent) and that all shareholders' stated capital investments be increased as follows:

| Shareholder | Stated capital |
|---|---|
| AFIL | $A125,000 |
| Mariani, Looney, and Gee | 250,000 |

The balance of shareholder loans would be repaid out of the lender's first advance, leaving the shareholders with stated capital accounts equal to their shareholdings and no loans outstanding to Simarloo.

Oram's proposal was rejected at a meeting of Simarloo's board of directors on January 16–17, 1972.

During its fiscal year ended June 30, 1972, Simarloo borrowed HK$400,000 from a Hong Kong bank with which it purchased 8,000 Dairy Farm shares upon which it had an option. On September 1, 1972, Simarloo sold 4,000 Dairy Farm shares and used the proceeds to repay the HK$400,000 loan.

At a July 10, 1972, board meeting, Simarloo's directors noted an indicated negative cash flow and a need for immediate additional financing.

On August 7, 1972, Mariani, Looney, and Gee held a board of directors meeting at which Simarloo's financing problems and alternatives for raising additional funds were reviewed. Peter Sowry, Simarloo's legal counsel, was of the opinion that the

Australian Reserve Bank would not approve additional loans. Accordingly, the board concluded that the best alternative would be to sell additional shares to the present shareholders.

At a board of directors meeting held on August 21, 1972, the board authorized the issuance of an additional U.S. $60,000 of stock to the existing shareholders.

In December 1972, 16,000 Dairy Farm shares were sold at a profit of $A449,830 to raise cash needed for operations.[8]

In January 1973, Dairy Farm was acquired by Hong Kong Land Co., Ltd. (hereinafter Hong Kong Land). Pursuant to that takeover, Simarloo received 2 shares of Hong Kong Land stock for each of its shares of Dairy Farm stock. Hong Kong Land stock was publicly traded on the Hong Kong stock exchange.

In May 1973, Simarloo sold 100,000 shares of Hong Kong Land to raise funds for the purpose of repaying shareholder loans.[9] In June 1973, Simarloo repaid shareholder loans

---

[8]On three occasions between 1969 and 1973, Simarloo received stock bonuses with respect to its Dairy Farm shares. These bonuses are detailed in the table set out in the succeeding footnote.

[9]The following table summarizes Simarloo's transactions in its Dairy Farm and Hong Kong Land shares:

| | Method of acquisition | Number of shares | Book value $A | Profit on sale $A |
|---|---|---|---|---|
| DAIRY FARM | | | | |
| December 1968 | Purchased | 16,655 | $A83,275 | |
| May 1969 | 1-for-1 bonus | 16,655 | | |
| | Balance | 33,310 | 83,275 | |
| September 1971 | Sale | 13,310 | 33,275 | $A123,706 |
| | Balance | 20,000 | 50,000 | |
| April 1972 | 3-for-5 bonus | 12,000 | | |
| April 1972 | 2-for-5 bonus | 8,000 | 56,657 | |
| | Balance | 40,000 | 106,657 | 123,706 |
| September 1972 | Sale | 4,000 | 10,666 | 47,847 |
| | Balance | 36,000 | 95,991 | |
| December 1972 | Sale | 16,000 | 42,663 | 449,830 |
| | Balance | 20,000 | 53,328 | |
| January 1973 | Exchange for 40,000 shares in Hong Kong Land Co., Ltd. | | | |
| HONG KONG LAND CO., LTD. | | | | |
| January 1973 | Shares by exchange | 40,000 | 53,328 | |
| April 1973 | 5-for-1 bonus | 200,000 | | |
| | Balance | 240,000 | 53,328 | |
| May 1973 | Sale | 100,000 | 22,222 | 715,253 |
| | Balance | 140,000 | 31,106 | |

totaling $A503,907: $A298,586 to AFIL, and $A205,321 to the U.S. shareholders.

All of Simarloo's purchases and sales of Dairy Farm and Hong Kong Land shares were effected in Hong Kong currency.

Immediately following the September 1972 sale of 4,000 Dairy Farm shares, HK$400,000 of the proceeds from the sale were used to satisfy Simarloo's debt to a Hong Kong bank. All of the rest of the proceeds from the various sales described above were returned to Australia and converted to Australian currency.[10]

Simarloo realized in its fiscal year ended June 30, 1973, a gain of $1,595,231 from its sales of Dairy Farm and Hong Kong Land shares.

Simarloo's balance sheets as of 6/30/68, 6/30/69, 6/30/70, 6/30/71, 6/30/72, and 6/30/73 are as shown on pp. 460–461 (in $A).

Simarloo had the following gross income for its fiscal year ended June 30, 1973:

|  | $A | US$ |
|---|---|---|
| Gross operating income from farming | $A488,684 | US$695,389 |
| Dividends and interest | 11,962 | 15,596 |
| Profit from the sale of Dairy Farm/Hong Kong Land stock (US$ figure includes currency exchange gain) | [11]1,200,052 | 1,595,231 |

As of June 30, 1973, Simarloo had earnings and profits of $1,567,800.

---

[10]The currency exchange rates between U.S., Australian, and Hong Kong currencies during the years relevant to this case were as follows:

|  | $A=HK$ $A1= | US$=HK$ US$1= | $A=US$ $A1= |
|---|---|---|---|
| December 1968 | HK$6.883 | HK$6.06 | US$1.1131 |
| September 1971 | 6.835 | 6.06 |  |
| April 1972 | 6.719 | 5.58 | 1.1886 |
| September 1972 | 6.672 | 5.65 | 1.1886 |
| December 1972 | 6.744 | 5.65 | 1.1886 |
| May 1973 | 7.35 | 5.085 | 1.4143 |

[11]This figure, to which the parties stipulated, is not consistent with the table reproduced in note 9, to which the parties also stipulated. Resolution of this inconsistency is not necessary to our decision in this case.

If Simarloo was a foreign personal holding company for its fiscal year ending June 30, 1973, its undistributed foreign personal holding company income was $1,532,161.

## IFTS and MFF

IFTS was incorporated under the laws of California on April 2, 1962. IFTS filed its Federal income tax return on the basis of a fiscal year ending April 30. Prior to 1971, Mariani transferred to his children a 17½-percent interest in IFTS, and IFTS was owned 82½ percent by Mariani and 17½ percent by his children until December 3, 1973. During 1971, Mariani transferred to IFTS all of his shares of Simarloo stock.

During IFTS's fiscal year in which ended Simarloo's year ended June 30, 1973, substantially all of IFTS's assets consisted of 10,500 class M ordinary shares and 10,926 class M preference shares of Simarloo, comprising 40 percent of Simarloo's outstanding shares. IFTS's adjusted basis in those shares as of December 3, 1973, was $114,448.89.[12] IFTS's return for the taxable period which began May 1, 1973, reported no income.

IFTS was a personal holding company for its taxable year beginning May 1, 1973, if it must include in gross income for that year section 551(b) dividends from Simarloo, and if such dividends qualify as dividends under the intendment of section 543(a)(1).

On November 5, 1973, IFTS entered into an arm's-length agreement with Dairy Farm calling for Australian Dairy Farm Ltd., Pty. (hereinafter ADF), a subsidiary of Dairy Farm, to purchase IFTS's interest in Simarloo for $A1,144,000, closing to occur on January 11, 1974. The agreement, which was conditioned upon LFG's entering into a similar agreement, provides that the sales price for the stock represents 40 percent of the value of Simarloo's outstanding shares. The sales price did represent 40 percent of the value of Simarloo's outstanding shares as of the date of the sale.

MFF was wholly owned by Mariani prior to April 1971. On April 1, 1971, Mariani gave 1,400 of his 2,000 shares in MFF to

---

[12]The stipulated basis, $114,448, was calculated without reference to sec. 551(e), the applicability of which is in dispute.

| | 6/30/68 | 6/30/69 | 6/30/70 | 6/30/71 | 6/30/72 | 6/30/73 |
|---|---|---|---|---|---|---|
| Cash | $A418 | $A2,046 | $A2,975 | $A28,870 | $A6,411 | $A531,126 |
| Inventory | 16,141 | 11,034 | 4,430 | 5,453 | 5,665 | 20,100 |
| Other current assets | 4,827 | 57,316 | 95,754 | 87,624 | 49,121 | 75,380 |
| Total current assets | 21,386 | 70,396 | 103,159 | 121,947 | 61,197 | 626,606 |
| Shares and loans in subsidiaries | --- | --- | 287 | 4,368 | 80,584 | 91,653 |
| Investment, Dairy Farm (or Hong Kong Land Co.) valued at cost | --- | 83,275 | 83,275 | 83,275 | 106,657 | 31,107 |
| Investment in AFIL | --- | 44,060 | 44,060 | 44,060 | 44,060 | 44,060 |
| Other investments | 30 | 126 | 159 | 174 | 590 | 10,697 |
| Fixed assets | 220,187 | 887,271 | 972,668 | 1,005,240 | 1,096,738 | 1,184,639 |
| Less: | | | | | | |
| Depreciation | (44,916) | (36,593) | (60,733) | (88,271) | (122,859) | (162,063) |
| Intangible and other | 292 | 4,304 | 3,590 | 2,815 | 1,764 | --- |
| Total assets | 196,979 | 1,052,839 | 1,146,465 | 1,173,608 | 1,268,731 | 1,826,699 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Current liabilities | 33,299 | 28,582 | 91,857 | 108,585 | 194,655 | 34,848 |
| Long-term liabilities | | | | | | |
| Mariani, Looney, and Gee | 198,848 | 211,153 | 210,978 | 210,978 | 210,978 | 5,657 |
| AFIL | --- | 150,000 | 250,000 | 300,000 | 300,000 | 1,414 |
| State Bank of S.A. | --- | --- | 75,000 | 200,000 | 250,000 | 300,000 |
| Hong Kong & Shanghai Bank | --- | --- | --- | --- | 56,657 | --- |
| P. A. Mariani, Jr. | 1,070 | --- | --- | --- | --- | --- |
| Mariani Enterprises | 713 | --- | --- | --- | --- | --- |
| Mariani and Looney | 54,624 | --- | --- | --- | --- | --- |
| Mortgage-freehold land | 30,000 | 30,000 | 30,000 | 30,000 | --- | --- |
| Total long-term liabilities | 285,255 | 391,153 | 565,978 | 740,978 | 817,635 | 307,071 |
| Total liabilities | 318,554 | 419,735 | 657,835 | 849,563 | 1,012,290 | 341,919 |
| Issued capital: | | | | | | |
| Class M ordinary | 1,500 | 2,000 | 2,000 | 2,000 | 2,000 | 42,000 |
| Class A ordinary | 500 | 500 | 500 | 500 | 500 | 10,500 |
| Class M preference | --- | 43,704 | 43,704 | 43,704 | 43,704 | 43,704 |
| Class A preference | --- | 10,926 | 10,926 | 10,926 | 10,926 | 10,926 |
| Reserves: | | | | | | |
| Share premium reserve | --- | 113,805 | 113,805 | 113,805 | 113,805 | 113,805 |
| Asset revaluation reserve | --- | 654,368 | 654,368 | 654,368 | 654,368 | 654,368 |
| Asset realization reserve | --- | --- | --- | --- | 123,706 | 1,336,636 |
| Accumulated income (losses) | (123,575) | (192,199) | (336,673) | (501,258) | (692,568) | (727,159) |
| Total capital and reserves | (121,575) | 633,104 | 488,630 | 324,045 | 256,441 | 1,484,780 |

his children. On December 3, 1973, Mariani's children returned to Mariani some of their shares in MFF so that MFF was owned 82½ percent by Mariani and 17½ percent by his children. The ownership of MFF remained unchanged through the end of MFF's fiscal year ended April 27, 1974.

MFF was in the business of freezing, packing, and distributing frozen food products. During its year ended April 27, 1974, and prior thereto, MFF's business operations generated substantial losses, which were reflected in its income tax returns filed in the years ended in 1968 through 1974 as follows:

| Year | Amount |
|------|--------|
| 1968 ...... | ($143,638) |
| 1969 ...... | (344,978) |
| 1970 ...... | (439,763) |
| 1971 ...... | (509,006) |
| 1972 ...... | (341,110) |
| 1973 ...... | 157,268 |
| 1974 ...... | (254,614) |
| | ($1,876,181) |

(This total is stipulated. Obviously it should be $1,875,841.)

On December 3, 1973, all IFTS shares were contributed to MFF, and on December 4, 1973, MFF's board of directors passed a resolution authorizing the merger of IFTS into MFF in accordance with section 4124 of the California Corporations Code as in effect prior to January 1, 1977. On December 4, 1973, MFF received the assets of IFTS, consisting primarily of Simarloo shares.

On December 18, 1973, MFF entered into an agreement with the Mariani Hong Kong Trust (hereinafter the Mariani Trust), whereby the trust purchased for $1,600,000 the Simarloo shares held by MFF. That price was not less than the fair market value of those shares on the date of the agreement.

The sales agreement called for payment of the purchase price in accordance with the following schedule:

| Due date | Principal | Interest 4% | Total |
|----------|-----------|-------------|-------|
| 12/18/74 | US$5,000 | US$64,000 | US$69,000 |
| 12/18/75 | 5,000 | 63,800 | 68,800 |
| 12/18/76 | 5,000 | 63,600 | 68,600 |
| 12/18/77 | 5,000 | 63,400 | 68,400 |
| 12/18/78 | 5,000 | 63,200 | 68,200 |
| 12/18/79 | 5,000 | 63,000 | 68,000 |
| 12/18/80 | 5,000 | 62,800 | 67,800 |

| Due date | Principal | Interest 4% | Total |
|----------|-----------|-------------|-------|
| 12/18/81 | US$5,000 | US$62,600 | US$67,600 |
| 12/18/82 | 5,000 | 62,400 | 67,400 |
| 12/18/83 | 5,000 | 62,200 | 67,200 |
| 12/18/84 | 5,000 | 62,000 | 67,000 |
| 12/18/85 | 5,000 | 61,800 | 66,800 |
| 12/18/86 | 5,000 | 61,600 | 66,600 |
| 12/18/87 | 5,000 | 61,400 | 66,400 |
| 12/18/88 | 5,000 | 61,200 | 66,200 |
| 12/18/89 | 5,000 | 61,000 | 66,000 |
| 12/18/90 | 5,000 | 60,800 | 65,800 |
| 12/18/91 | 5,000 | 60,600 | 65,600 |
| 12/18/92 | 5,000 | 60,400 | 65,400 |
| 12/18/93 | 1,505,000 | 60,200 | 1,565,200 |
| Purchase price: | 1,600,000 | 1,242,000 | 2,842,000 |

The Mariani Trust has timely made all payments of principal and interest due under this schedule.

In its Federal income tax return for its taxable year ended April 17, 1974, MFF elected to report gain from the sale of Simarloo shares to the Mariani Trust on the installment basis, pursuant to section 453. MFF reported no income from the sale during its taxable year ended April 27, 1974, since no payments were received from the Mariani Trust during that fiscal year.

On January 11, 1974, the Mariani Trust sold its Simarloo shares to ADF for $A1,144,000. Immediately following this sale, the proceeds were converted into US$1,698,840 and deposited with various U.S. banks. All funds of the Mariani Trust remained invested in bank obligations until the date of the trial in this case.

### LFG and Its Transferees

LFG was incorporated under the laws of California on May 6, 1971. Its capital stock was then owned by Looney (75-percent interest) and his son-in-law, Gee (25-percent interest). On or before October 7, 1972, Looney and Gee transferred to LFG 10,926 shares of Simarloo's M preference stock and 10,500 shares of Simarloo's M ordinary stock, comprising 40 percent of Simarloo's outstanding shares.

On or about February 8, 1973, Looney sold his interest in LFG in equal parts to his two daughters, Kathleen L. Gee and Joel-Ann Foote. On January 7, 1974, Kathleen L. Gee donated

85 shares of LFG stock to the Kathleen E. Gee Trust and 85 shares of LFG stock to the Melinda L. Gee Trust. LFG then had 4,800 shares outstanding.

On November 5, 1973, LFG entered into an arm's-length agreement with ADF, under the terms of which ADF was to purchase LFG's Simarloo shares for $A1,144,000, closing to occur on January 11, 1974. The agreement further provided that the sales price of LFG's shares represented 40 percent of the value of Simarloo's outstanding shares. The sales price did represent 40 percent of the value of Simarloo's outstanding shares at the date of sale.

On January 8, 1974, the directors of LFG resolved to dissolve the corporation, and to sell and distribute the corporation's assets within 12 months. This resolution was approved by the shareholders.

On January 11, 1974, pursuant to the agreement of November 5, 1973, LFG sold its Simarloo shares to ADF for $A1,144,000, the equivalent of US$1,698,840.

On its corporate income tax return for its fiscal year ended April 30, 1974, LFG reported interest income of $14,631 and deductions of $20,113, for a net loss of $5,482. LFG also reported gain of $1,652,381 on the sale of its Simarloo stock, and excluded that gain from income under section 337.

LFG was a personal holding company for its year beginning May 1, 1973, even if it is not required to include in gross income for that year a section 551(b) constructive dividend from Simarloo.

As part of its return for its taxable year ended April 30, 1974, LFG included a Form 3646 (Income from Controlled Foreign Corporation) and a "Statement Regarding Exclusion of Income under Section 954(b)(4)." On the Form 3646, LFG disclosed that Simarloo had earnings and profits for the taxable year of $1,537,794. In answer to the following question, "Is the controlled foreign corporation a foreign investment company or a foreign personal holding company?", LFG marked "No." The "Statement Regarding Exclusion of Income under Section 954(b)(4)" disclosed that Simarloo had realized from the sale of Dairy Farm/Hong Kong Land shares a gain of $1,345,149. It also disclosed that Simarloo actively engaged in ranching and farming operations in Australia, and stated that Simarloo had sold the shares to raise funds for the reduction of

outstanding debt. At no point in its return for either its year ended April 30, 1974, or its short year ended January 3, 1975, did LFG disclose the amount of Simarloo's gross income for its fiscal year ended June 30, 1973.

On February 14, 1974, LFG made liquidating distributions to its shareholders as follows:

| | |
|---|---|
| Robert E. Gee (Gee) | $250,000.00 |
| Kathleen L. Gee | 339,583.34 |
| Joel-Ann Foote | 375,000.00 |
| Melinda L. Gee Trust | 17,708.33 |
| Kathleen E. Gee Trust | 17,708.33 |

On January 3, 1975, LFG made liquidating distributions to its shareholders as follows:

| | |
|---|---|
| Gee | $178,808 |
| Kathleen L. Gee | 242,882 |
| Joel-Ann Foote | 268,213 |
| Melinda L. Gee Trust | 12,666 |
| Kathleen E. Gee Trust | 12,666 |

By January 3, 1975, LFG had distributed all its assets and, on that day, the corporation was dissolved.

The distributees of LFG reported the following amounts received from LFG on February 14, 1974, as dividends:

| | |
|---|---|
| 1974 return of Gee and Kathleen L. Gee | $163,700 |
| 1974 return of Joel-Ann Foote | 77,892 |

The following amounts of the liquidating distributions were reported as capital gains:

| | |
|---|---|
| 1974 return of Gee and Kathleen L. Gee | $401,620 |
| 1974 return of Joel-Ann Foote | 273,336 |

Of the amounts distributed January 3, 1975, $15,324 was reported as dividend distributions.[13]

On June 30, 1978, the respondent sent to LFG by certified mail a notice of deficiency determining deficiencies in income

---

[13]The record does not disclose the specific amounts reported as dividends by the various distributees.

taxes for its taxable years ending April 30, 1974, and January 3, 1975, in the amounts of $730,147 and $5,316, respectively. No petition requesting a redetermination of the deficiencies determined in the June 30, 1978, deficiency notice was filed in the Tax Court and such deficiencies, plus statutory interest thereon, were assessed on November 6, 1978.

On June 29, 1979, the respondent sent to the following persons, as transferees of LFG, notices of liability for portions of the deficiencies determined against LFG:

| Name | Docket number in which petitioner |
|---|---|
| Gee | 13829–79 |
| Kathleen L. Gee | 13830–79 |
| Joel-Ann Foote | 13828–79 |
| Gee and Kathleen L. Gee, Trustees for Kathleen E. Gee Trust | 13827–79 |
| Gee and Kathleen L. Gee, Trustees for Melinda L. Gee Trust | 13826–79 |

## OPINION

### Issue 1. Was Simarloo Foreign Personal Holding Company for Its Fiscal Year Ended June 30, 1973?

The foreign personal holding company provisions, as relevant to the disposition of this issue, provide as follows:

SEC. 551. FOREIGN PERSONAL HOLDING COMPANY INCOME TAXED TO UNITED STATES SHAREHOLDERS.

(a) GENERAL RULE.—The undistributed foreign personal holding company income of a foreign personal holding company shall be included in the gross income of the citizens or residents of the United States, domestic corporations, domestic partnerships, and estates or trusts (other than estates or trusts the gross income of which under this subtitle includes only income from sources within the United States), who are shareholders in such foreign personal holding company (hereinafter called "United States shareholders") in the manner and to the extent set forth in this part.

(b) AMOUNT INCLUDED IN GROSS INCOME.—Each United States shareholder, who was a shareholder on the day in the taxable year of the company which was the last day on which a United States group (as defined in section 552(a)(2)) existed with respect to the company, shall include in his gross income, as a dividend, for the taxable year in which or with which the taxable year of the company ends, the amount he would have received as a dividend (determined as if any distribution in liquidation actually made in such taxable year had not been made) if on such last day there had been distributed by the company, and received by the shareholders, an amount

which bears the same ratio to the undistributed foreign personal holding company income of the company for the taxable year as the portion of such taxable year up to and including such last day bears to the entire taxable year.

## SEC. 552. DEFINITION OF FOREIGN PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For purposes of this subtitle, the term "foreign personal holding company" means any foreign corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 60 percent of its gross income (as defined in section 555(a)) for the taxable year is foreign personal holding company income as defined in section 553; but if the corporation is a foreign personal holding company with respect to any taxable year ending after August 26, 1937, then, for each subsequent taxable year, the minimum percentage shall be 50 percent in lieu of 60 percent, until a taxable year during the whole of which the stock ownership required by paragraph (2) does not exist, or until the expiration of three consecutive taxable years in each of which less than 50 percent of the gross income is foreign personal holding company income. For purposes of this paragraph, there shall be included in the gross income the amount includible therein as a dividend by reason of the application of section 555(c)(2); and

(2) STOCK OWNERSHIP REQUIREMENT.—At any time during the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals who are citizens or residents of the United States, hereinafter called "United States group".

## SEC. 553. FOREIGN PERSONAL HOLDING COMPANY INCOME.

(a) FOREIGN PERSONAL HOLDING COMPANY INCOME.—For purposes of this subtitle, the term "foreign personal holding company income" means that portion of the gross income, determined for purposes of section 552, which consists of:

\* \* \* \* \* \* \*

(2) STOCK AND SECURITIES TRANSACTIONS.—Except in the case of regular dealers in stock or securities, gains from the sale or exchange of stock or securities.

(3) COMMODITIES TRANSACTIONS.—Gains from futures transactions in any commodity on or subject to the rules of a board of trade or commodity exchange. This paragraph shall not apply to gains by a producer, processor, merchant, or handler of the commodity which arise out of bona fide hedging transactions reasonably necessary to the conduct of its business in the manner in which such business is customarily and usually conducted by others.

## SEC. 554. STOCK OWNERSHIP.

(a) CONSTRUCTIVE OWNERSHIP.—For purposes of determining whether a corporation is a foreign personal holding company, insofar as such determination is based on stock ownership under section 552(a)(2), section 553(a)(5), or section 553(a)(6)—

(1) STOCK NOT OWNED BY INDIVIDUAL.—Stock owned, directly or indirectly, by or for a corporation, partnership, estate, or trust shall be considered

as being owned proportionately by its shareholders, partners, or beneficiaries.

(2) FAMILY AND PARTNERSHIP OWNERSHIP.—An individual shall be considered as owning the stock owned, directly or indirectly, by or for his family or by or for his partner. For purposes of this paragraph, the family of an individual includes only his brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

SEC. 555. GROSS INCOME OF FOREIGN PERSONAL HOLDING COMPANIES.

(a) GENERAL RULE.—For purposes of this part, the term "gross income" means with respect to a foreign corporation, gross income computed (without regard to the provisions of subchapter N (sec. 861 and following)) as if the foreign corporation were a domestic corporation which is a personal holding company.

We are called upon to decide whether, for purposes of section 552(a)(2), IFTS and LFG together owned stock worth more than 50 percent in value of Simarloo's outstanding shares; whether, for purposes of sections 552(a)(1), 553(a), and 555(a), more than 60 percent of Simarloo's gross income, for its fiscal year ended June 30, 1973, was foreign personal holding company income;[14] and, whether under the circumstances of this case, the rule of *Alvord v. Commissioner*, 277 F.2d 713 (4th Cir. 1960), creates an exception to the requirement of section 551(b) that IFTS and LFG must include in gross income their ratable shares of Simarloo's undistributed foreign personal holding company income for its fiscal year ended June 30, 1973. We address each of the foregoing subissues in separate subsections.

## A. VALUATION OF IFTS AND LFG's SIMARLOO SHARES

For Simarloo to qualify as a foreign personal holding company for its taxable year ended June 30, 1973, at any time during that taxable year, more than 50 percent in value of its stock must have been owned, directly or indirectly, by a "United States group" composed of not more than five individuals who are U.S. citizens. Sec. 552(a)(2). Petitioners have conceded that five or fewer U.S. citizens, constituting a "United States group" for purposes of section 552(a)(2), owned

---

[14]Petitioners put forward two separate arguments designed to show that less than 60 percent of Simarloo's gross income was foreign personal holding company income. We address each argument separately.

80 percent of Simarloo's shares for its year ended June 30, 1973.[15] Petitioners contend, however, that the Simarloo shares held by the "United States group" constituted 50 percent or less in value of Simarloo's outstanding shares.

Petitioners concede that the U.S. shareholders were entitled to 80 percent of any dividends declared by Simarloo, and to 80 percent of the company's assets upon liquidation. Nevertheless, they argue that we must apply large discounts to each of the two U.S.-shareholder-controlled blocks of Simarloo class M shares.

Petitioners have the burden of proving that the class M shares of Simarloo were worth 50 percent or less in value of Simarloo. Rule 142(a). In attempting to meet their burden of proof, petitioners rely totally on the testimony and report of their expert, Dr. G. Stephen Jizmagian.

Dr. Jizmagian employed three different valuation techniques. The first technique we will discuss is his "Valuation using previous equity purchase." This method involved comparing the total cash contributions to capital of the class M shareholders with the total cash contributions to capital of the class A shareholders, on the theory that that ratio would indicate the 1973 relative values of the M and the A shares.

Dr. Jizmagian calculated the total capital contributions by each class as follows:

| Class M | Class A | |
|---|---|---|
| $2,000 | Ordinary stock | $114,305 |
| 43,704 | Preferred stock | 10,926 |
| 211,153 | Loan commitment | 300,000 |
| | | 425,231 |
| | | - 44,060 (invested in AFIL |
| 256,857 | Total | 381,171 by Simarloo) |

Based on this table, Dr. Jizmagian concluded that the relative value of the total class M shares was 40.3 percent of the total equity contribution. Each class M block was thus worth 20.1

---

[15]Throughout Simarloo's year ended June 30, 1973, IFTS and LFG each owned blocks of class M shares. Each such block represented 40 percent of outstanding Simarloo stock. These shares are attributable to Mariani, Looney, and Gee under the attribution rules of sec. 554. AFIL, an Australian subsidiary of Dairy Farm, held class A shares representing the remaining 20 percent of Simarloo's outstanding shares.

percent of the total value of Simarloo, and the class A shares were worth 59.7 percent of Simarloo's total value.

There are several significant problems with Dr. Jizmagian's valuation using previous equity purchase. In applying this method, Dr. Jizmagian gave no weight to the fact that Simarloo's assets were revalued in 1968 pursuant to the negotiations between Simarloo and Dairy Farm. The revaluation revealed that those assets had increased $A654,368 above their book value, and Dairy Farm relied upon this revaluation in its negotiations with Simarloo. This suggests it is unlikely that Dairy Farm thought in 1968 that its investment in Simarloo represented 59.7 percent of Simarloo's capital. Even apart from this consideration, it strains credulity to think that Dairy Farm would have been satisfied with a 20-percent voting interest and share of profits if it believed it was acquiring a 59.7-percent interest in Simarloo. It is thus clear that this valuation method does not reflect the valuation arrived at by Simarloo and Dairy Farm in arm's-length negotiations.

Additionally, in applying the valuation using the equity purchase method, Dr. Jizmagian assumed that the A shareholder's debt investment in Simarloo was an equity investment. The record tends to support the opposite conclusion, however. AFIL's advance of $A300,000 to Simarloo was consistently carried on Simarloo's books as debt; it was not in proportion to AFIL's equity investment in Simarloo; it was secured by a lien on Simarloo's assets; and, it was repaid in June 1973.

Because of the foregoing considerations, we are unable to accept Dr. Jizmagian's valuation using previous equity purchase as a valid method of valuing the class M shares.

The second method used by Dr. Jizmagian was his valuation based on discount/premium statistics. Under this method, Dr. Jizmagian applied to each block of M shares a 34-percent minority discount derived from a statistical tabulation of minority discounts allowed by courts. Dr. Jizmagian then applied an additional discount of 33 percent to reflect the fact that each block of M shares was less marketable than was a 100-percent interest in Simarloo. The discount applied, 33 percent, represents the average discount used by four closed-end investment companies in the purchase of letter stock. Using these two discounts in turn, Dr. Jizmagian calculated

that the relative value of each block of class M shares was 17.6 percent of the value of Simarloo as a whole.

For at least two reasons, Dr. Jizmagian's valuation based on discount/premium statistics cannot be relied on as a measure of the value of the class M shares. First, in applying a minority discount and then a separate discount for lack of marketability, Dr. Jizmagian is guilty of double counting. On the record before us, and Dr. Jizmagian does not assume otherwise, the only cause for the reduced marketability of each block of class M shares is that each block represented a minority interest in Simarloo. On these facts, there is no lack of marketability discount allowable in addition to the minority discount.

The second problem with Dr. Jizmagian's valuation based on discount/premium statistics lies not in his methodology or his calculations, but in a misapprehension of the applicable law. In calculating the relative value of each block of class M shares, Dr. Jizmagian compared each block of M shares with the total value of Simarloo. Section 552(a)(2), however, states that to meet the stock ownership requirement, a U.S. group must own "more than 50 percent in value of [the foreign corporation's] outstanding stock." For purposes of section 552(a)(2), then, the relevant consideration is not the value of each class M block relative to Simarloo, but the value of each class M block relative to the value of Simarloo's outstanding stock. In his valuation based on discount/premium statistics, Dr. Jizmagian applied a minority discount to the class M shares. But the class A shares represent even a smaller interest in Simarloo than each class M block; it follows that a minority discount must apply to the class A block. If each block of class M shares is discounted by 34 percent, and the block of class A shares is discounted by the same amount, the class M blocks together still total 80 percent of the value of Simarloo's outstanding stock. We conclude that Dr. Jizmagian's valuation based on discount/premium statistics provides no support for petitioners' contention that the class M shares represented 50 percent or less in value of Simarloo's outstanding stock.

The third valuation method employed by Dr. Jizmagian was his discounted present value approach. Under this approach, Dr. Jizmagian assumed that Simarloo would require a certain influx of cash in the years between 1974 and 1979. He

predicted a certain positive cash flow in years 1981–83. He then estimated that Simarloo's total value in January 1974 was $2,860,000.[16] Dr. Jizmagian also postulated that in 1983, Simarloo would have a market value equal to its underlying asset value added to a multiple of 10 times 1983 cash flow; and, that a present value discount factor of 25 percent per year would apply to the cash flow. Based on these assumptions, Dr. Jizmagian calculated that the present value of Simarloo in 1973 was $1,016,000, or 41.8 percent of its assumed asset value. The net present value of an M block thus was 41.8 percent of 40 percent, or 16.7 percent of the total value of Simarloo.

Even if we accept as correct Dr. Jizmagian's numerical assumptions, the discounted present value approach is subject to the same criticism earlier directed to the valuation based on discount/premium statistics: even if Dr. Jizmagian is correct in finding that each class M block is worth only 16.7 percent of the total value, on the discounted present value approach, the A block must also be discounted by 41.8 percent, with the result that the class M blocks together are equal to 80 percent of the value of Simarloo's outstanding stock.

After presenting the three valuation methods discussed above, Dr. Jizmagian summarized his results. In the summary, he asserted that the class M shares were worth 40.3 percent of the value of Simarloo. He then concluded that the class A shares were worth 59.7 percent of the value of Simarloo. We see no reason to accept this conclusion. First, as discussed above, following the logic of Dr. Jizmagian's valuation based on discount/premium statistics and his discounted present value approach, the class A shares were worth 20 percent of Simarloo, discounted by either 41.8 or 34 percent.

Second, in concluding that the class A shares were worth 59.7 percent of Simarloo's value, Dr. Jizmagian flies in the face of the arm's-length sale of the class M shares to ADF. By the terms of the sales agreements, ADF paid 80 percent of Simarloo's total value to acquire the class M shares.[17]

---

[16]This estimate was apparently based on the sales price of the Jan. 11, 1974, sale of Simarloo shares to ADF.

[17]Dr. Jizmagian argued in his report that we should not consider the aforementioned sale in valuing the M shares because it was "tantamount to a sale or merger of the entire corporation in which event any shareholder no matter how many shares he owns will be

Neither petitioners nor Dr. Jizmagian argue that any factors intervening between the end of Simarloo's 1972–73 fiscal year and the date of the sale affected the value of Simarloo. We have held that an arm's-length sale close in time to the valuation date is persuasive evidence of value absent a showing that some event between the valuation date and the sales date caused such value to change. *Douglas Hotel Co. v. Commissioner*, 14 T.C. 1136, 1141 (1950), affd. 190 F.2d 766 (8th Cir. 1951), cert. denied 342 U.S. 893 (1951). Dr. Jizmagian's estimate of the value of the class A shares is thus inconsistent not only with his own valuation methods, but also with persuasive evidence in the record.

Petitioners advanced no valuation methods other than those developed by their expert to establish the value of the class M shares. We have found each of the valuation methods of petitioners' expert to be fatally flawed, and we therefore find that petitioners have failed to meet their burden of proving that the class M shares represented 50 percent or less in value of Simarloo's outstanding shares. It follows that for its fiscal year ended June 30, 1973, Simarloo met the requirements of section 552(a)(2).

## B. CHARACTER OF FOREIGN CURRENCY EXCHANGE GAIN

For Simarloo to qualify as a foreign personal holding company for its year ended June 30, 1973, at least 60 percent of its gross income in that fiscal year must have been foreign personal holding company income. Sec. 552(a)(1).

Foreign personal holding company income includes gains from stock and securities transactions except in the case of securities dealers. Sec. 553(a)(2). Foreign personal holding company income does not include gains from the sale of commodities, except for gains from future transactions in any commodity on or subject to the rules of a board of trade or commodity exchange. Sec. 553(a)(3).

Simarloo realized $1,595,231 gain on the sale of Dairy Farm/Hong Kong Land stock in its 1972–73 fiscal year. The

---

entitled to a pro rata share of the proceeds." This contention is without foundation. The record contains no suggestion that the sales price was not determined in arm's-length negotiations, or that there would have been any impropriety in ADF's and the U.S. shareholders' settling on a price less than 80 percent of the value of Simarloo.

parties have stipulated that the US$1,595,231 gain includes a $250,016 foreign currency exchange gain arising from the increase in value of the Australian dollar against the U.S. dollar between the dates of purchase and disposition of Dairy Farm/Hong Kong Land shares. This foreign currency exchange gain was calculated by converting the Australian dollar cost of Simarloo's Dairy Farm shares into U.S. dollars at the exchange rates prevailing on the dates of purchase, converting the Australian dollar sale price to U.S. dollars at the exchange rates prevailing on the dates of purchase, and subtracting the resulting U.S. dollar figure from the difference between the U.S. dollar purchase prices translated at the exchange rates prevailing on the dates of purchase and the U.S. dollar sale prices translated at the exchange rates in effect on the dates of sale.

The parties disagree as to how Simarloo's 1972–73 foreign currency exchange gain should be characterized for purposes of determining whether 60 percent of Simarloo's income in its fiscal year ended June 30, 1973, was foreign personal holding company income.[18] Petitioners, relying on the doctrine that foreign currency is a commodity for U.S. tax purposes, argue that Simarloo's foreign currency exchange gain is gain on a commodity transaction, and so may not be characterized as foreign personal holding company income under the intendment of section 553(a). Respondent takes the position that Simarloo's foreign currency exchange gain should be treated as part of its gain on the sale of stock, and hence that such gain must be characterized as foreign personal holding company income.[19]

---

[18]The parties have stipulated that if Simarloo's currency exchange gain is foreign personal holding company income, more than 60 percent of Simarloo's gross income for its fiscal year ended June 30, 1973, is foreign personal holding company income and that if the currency exchange gain is not foreign personal holding company income, less than 60 percent of Simarloo's gross income for that taxable year is foreign personal holding company income.

[19]Although respondent stipulated to the existence of a currency exchange gain of $250,016, on brief he argues that Simarloo's gain on the sale of Dairy Farm/Hong Kong Land shares should be calculated by converting the Australian dollar cost of such shares into U.S. dollars at the exchange rate on the date of purchase, and converting the Australian dollar sales price of such shares into U.S. dollars at the exchange rate on the day of sale. If this procedure were followed, there would be no currency exchange gain attributable to Simarloo's sale of its Dairy Farm shares.

Since, as discussed in the text, we hold that petitioners' argument, that the currency

To support their argument that the $250,016 currency exchange gain is attributable to a commodity transaction, petitioners rely on the "two-transaction" doctrine articulated by a line of our cases. *Church's English Shoes, Ltd. v. Commissioner*, 24 T.C. 56 (1955), affd. per curiam 229 F.2d 957 (2d Cir. 1956); *Joyce-Koebel v. Commissioner*, 6 B.T.A. 403 (1927); *Bernuth-Lembcke Co. v. Commissioner*, 1 B.T.A. 1051 (1925). In each of these cases, the taxpayers purchased goods at prices denominated in pounds sterling, but paid for the goods with pounds acquired in transactions separate from the purchase of goods. Thus in *Church's English Shoes, Ltd. v. Commissioner, supra*, and *Joyce-Koebel v. Commissioner, supra*, the taxpayers purchased goods on credit, and satisfied their credit obligations with pounds acquired after lapses of time, during which the price of pounds fell. As we noted in *Church's English Shoes, Ltd.*, "There were two transactions, for accounting and tax purposes, one involving the purchase and sale of * * * [goods], the other a 'speculation' in foreign exchange." (24 T.C. at 59.)

In *Bernuth-Lembcke Co. v. Commissioner, supra*, the taxpayer entered into a contract to buy 110,000 pounds which it planned to use to buy goods. Between the time this contract to purchase pounds was entered into and the time it was executed, the price of pounds fell. Upon acquiring the pounds the taxpayer used them to purchase goods. We held that the taxpayer's basis in those goods was to be determined at the rate of exchange between pounds and dollars on the day such goods were purchased, and that the taxpayer's transaction in pounds gave rise to a loss recognized in the year incurred. 1 B.T.A. at 1054.

In each of the cases just discussed, the taxpayers took either a long (*Bernuth-Lembcke Co.*) or a short (*Joyce-Koebel, Church's English Shoes, Ltd.*) position in pounds. In economic effect, each taxpayer was thus speculating in foreign exchange. *Joyce-Koebel v. Commissioner, supra* at 406.

exchange gain which appears on their proposed method of accounting for the sale of the Dairy Farm shares is a gain from the sale of a commodity, is completely without merit, we need not choose between petitioners' and respondent's proposed methods of accounting for Simarloo's gain from the sale of Dairy Farm/Hong Kong Land shares.

In the present case, Simarloo used its own Australian dollars to purchase Dairy Farm shares. Simarloo was not speculating in foreign currency on this transaction because its purchase of Dairy Farm stock was completed in one transaction (cash purchase), rather than two (purchase on credit of goods denominated in a foreign currency, satisfaction of credit obligation with foreign currency acquired earlier or later than the date of the purchase). We conclude, therefore, that the "two-transaction" cases cited by petitioners are inapposite to the case before us, and do not support petitioners' argument that Simarloo's $250,016 currency exchange gain is attributable to a transaction in commodities.[20]

Petitioners also cite as support for their position respondent's Rev. Rul. 75–105, 1975–1 C.B. 29; Rev. Rul. 75–106, 1975–1 C.B. 31; and Rev. Rul. 75–107, 1975–1 C.B. 32. These rulings explain two permissible methods of computing the income or loss from a foreign branch of a U.S. corporation: the "net worth" or "balance sheet" method (Rev. Rul. 75–105; Rev. Rul. 75–106), and the profit/loss method (Rev. Rul. 75–107).

Respondent neither disputes nor concedes the propriety of using the net worth or the profit/loss method for calculating income of a foreign personal holding company, because in respondent's view, neither method supports petitioners' position. We agree with respondent. The net worth[21] and profit/loss methods are two ways of accounting in U.S. dollars for the operations of foreign branches that keep their books in

---

[20]Our conclusion that Simarloo's currency exchange gain was not gain from a commodity transaction comports with economic reality. By converting $A83,275 into Hong Kong currency with which to purchase Dairy Farm shares, rather than retaining such Australian currency and borrowing U.S. dollars with which to acquire the Dairy Farm stock, Simarloo effectively gave up any chance of reaping gain with respect to that $A83,275 from depreciation of the U.S. dollar against the Australian dollar. Put more simply, Simarloo could not realize gain from an increase in value of Australian dollars that it did not own.

[21]The net worth method, as promulgated in Rev. Rul. 75–105, 1975–1 C.B. 29, and Rev. Rul. 75–106, 1975–1 C.B. 31, requires a foreign branch to carry noncurrent assets on its books at the currency exchange rates prevalent at the date of their acquisition. Current assets are carried at the exchange rate in effect at the close of the taxable year. On this method, Simarloo's taxable gain for its fiscal year ended May 30, 1973, attributable to the sale of Dairy Farm stock would be reflected as follows: the net worth as of June 1, 1972, would include Simarloo's Dairy Farm shares, listed at their U.S. dollar cost basis calculated using the exchange rate on the dates of acquisition. The net worth as of May 30, 1973, would include Simarloo's current assets, including cash acquired from the sale of Dairy Farm sales, at the exchange rate prevailing on May 30, 1973. The net worth method thus is not consistent with petitioners' method of calculating Simarloo's currency translation gain.

foreign currency. Under neither method is gain or loss attributable to currency fluctuations broken out as a separate item of gain or loss. Neither method, therefore, is compatible with petitioners' proposed analysis of Simarloo's currency exchange gain as an item separate and distinct from its sales of Dairy Farm/Hong Kong Land stock.

Petitioners make the policy argument that a refusal to treat Simarloo's currency exchange gain as a separate transaction means that a foreign corporation might qualify as a foreign personal holding company solely on the basis of currency exchange gains or losses, a result inconsistent with the intent of the foreign personal holding company provisions. Unfortunately for petitioners, the same result can follow from treating currency translation gains or losses, calculated on petitioners' method, as separate items of gain or loss not qualifying as foreign personal holding company income. Thus, suppose that one U.S. citizen owns an Australian corporation, Z, which has gross income of $A100 during a particular taxable year: $A50 gross farming income, and $A50 gain on sale of stock. Suppose that upon translation to U.S. dollars using petitioners' proposed method there is a ($37.50) currency exchange loss arising from the sale of stock, due to an increase in value of the U.S. dollar against the Australian dollar between the date on which the stock was purchased and the date on which it was sold.[22]

Expressed in U.S. dollars, Z would have $50 gross farming income, $62.50 gain on sale of stock, and ($37.50) currency translation loss. On petitioners' proposed method, the currency translation loss would reduce Z's gross income to $75 without reducing Z's $62.50 gain on sale of stock, and Z would qualify as a foreign personal holding company. Petitioners'

---

[22]For example, Z may have purchased X stock for $A100 when $A1=$1.25, and sold X stock for $A150 when $A1=$1. On petitioners' method, Z has $62.50 gain on sale of stock (measuring U.S. dollar gain on the sale by subtracting the U.S. purchase price from the U.S. sales price, both calculated using the exchange rate in effect on the date of purchase) and ($37.50) currency translation loss, measured by subtracting the U.S. profit calculated above, $62.50, from the difference between the U.S. purchase price calculated as above and the U.S. sales price calculated using the exchange rate in effect on the date of sale, or $25. Thus, $25 − $62.50=($37.50).

Of course, if we used the accounting method advocated by respondent on brief, as set out above, note 19, there would be no currency exchange loss attributable to the transaction described above, but simply a $25 gain from sale of stock.

policy argument is a double-edged sword that cuts against their position to the same extent that it supports it, and is therefore unpersuasive.

Finally, petitioners argue that their method of accounting for Simarloo's currency translation gain was adopted by the Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 8 (1975) (hereinafter FASB No. 8).

FASB No. 8 provides that the foreign branch of a U.S. corporation shall calculate gain on the sale of a noncurrent asset by translating both the foreign currency purchase and sales prices at the currency exchange rate prevalent on the date of purchase, and should report any gain or loss attributable to a difference between the exchange rates on date of purchase and date of sale as currency translation gain or loss. FASB No. 8, pars. 12(a), 16.

As noted above, note 19, we do not think that resolution of the issue here under consideration requires us to choose between petitioners' and respondent's proposed methods of accounting in U.S. dollars for Simarloo's gain from the sale of Dairy Farm/Hong Kong Land shares. Regardless of how Simarloo's gain is accounted for in U.S. dollars, in economic effect, none of Simarloo's gain from the stock sale is attributable to currency fluctuation, and FASB No. 8 is in accord with our analysis on this point.[23]

Based on the foregoing, we hold that the entire gain attributable to Simarloo's sale of Dairy Farm/Hong Kong Land shares during its fiscal year ended June 30, 1973, was gain from the sale of securities, and therefore was foreign

---

[23]"The Board considered and rejected the one-transaction view. Specifically, the Board rejected the idea that the cost of an imported asset or the reported revenue from an export sale is affected by later changes in the related liability or receivable. The exchange exposure in a purchase or sale transaction whose price is denominated in foreign currency stems not from the purchase or sale itself but from a delay in payment or receipt of the equivalent dollars. No exchange gain or loss can occur if, as soon as the price is fixed in foreign currency, the U.S. purchaser immediately buys foreign currency with dollars and pays the foreign seller, or the U.S. seller receives foreign currency from the foreign buyer and immediately converts it into dollars. In other words, exchange gains and losses on import or export transactions result from a combination of a rate change and one of the following: the U.S. buyer owes an amount denominated in foreign currency, or the U.S. seller holds a receivable denominated in foreign currency or holds foreign currency received from a foreign buyer. [Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 8, par. 114 (1975).]"

personal holding company income. It follows that for its year ended June 30, 1973, Simarloo met the 60 percent of gross income test of section 552(a)(i).

## C. APPLICABILITY OF CORN PRODUCTS DOCTRINE

Section 553(a)(2) provides that gain from the sale of stock is foreign personal holding company income. We held above that in its fiscal year ended June 30, 1973, Simarloo realized $1,595,231 on the sale of stock, and that this represented more than 60 percent of Simarloo's gross income for that fiscal year. Petitioners argue, however, that the Dairy Farm/Hong Kong Land shares sold by Simarloo were ordinary assets in Simarloo's hands, relying on *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955), and that Simarloo's gain on the sale of Dairy Farm and Hong Kong Land stock should therefore not be categorized as foreign personal holding company income. Since we find that in its year ended June 30, 1973, Simarloo's Dairy Farm/Hong Kong Land shares were capital assets under the doctrine of *Corn Products Refining Co. v. Commissioner, supra,* we need not address the question of whether gains realized by a foreign corporation on the sale of securities that are not capital assets in its hands constitute foreign personal holding company income.

In *Corn Products Refining Co.,* the Supreme Court stated that. "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." (350 U.S. at 52.) The *Corn Products Refining Co.* doctrine has been applied to the situation in which one corporation disposes of stock in another corporation. As stated in *Booth Newspapers, Inc. v. United States*, 157 Ct. Cl. 886, 303 F.2d 916, 921 (1962):

if securities are purchased by a taxpayer as an integral and necessary act in the conduct of his business, and continue to be so held until the time of their sale, any loss incurred as a result thereof may be fully deducted from gross income as a business expense or ordinary loss. If, on the other hand, an investment purpose be found to have motivated the purchase or holding of the securities, any loss realized upon their ultimate disposition must be treated in accord with the capital asset provisions of the Code.

In recognition of the fact that a corporation's purpose in holding an asset may change over time, we have held that the determination whether stock is held as an integral and

necessary act in the conduct of a corporation's trade or business or for an investment purpose must be made with reference to the corporation's reasons for holding the stock in the period during which the stock is sold. *W. W. Windle Co. v. Commissioner*, 65 T.C. 694, 714 n. 15 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977); *Chemplast, Inc. v. Commissioner*, 60 T.C. 623, 632 n. 9 (1973), affd. without published opinion 506 F.2d 1050 (3d Cir. 1974); *Missisquoi Corp. v. Commissioner*, 37 T.C. 791, 796–797 (1962).[24]

Petitioners contend that Simarloo acquired and held Dairy Farm/Hong Kong Land stock for the business purpose of guaranteeing a market for its agricultural produce.

Simarloo's initial purchase of 16,655 Dairy Farm shares represented a 2.33-percent interest in Dairy Farm. It seems fair to assume, although the record is inadequate, that upon exchanging its Dairy Farm shares for Hong Kong Land shares, Simarloo held a significantly smaller percentage interest in Hong Kong Land than it had held in Dairy Farm.

It strains credulity to think that Simarloo's directors believed Simarloo's interest in Dairy Farm/Hong Kong Land provided any assurance that Dairy Farm would market Simarloo's produce. Dairy Farm's incentive to market Simarloo's produce grew out of its 20-percent interest in Simarloo, not out of Simarloo's small interest in Dairy Farm.

In September 1971, Simarloo sold over one-third of its Dairy Farm shares to raise funds needed to develop its business. In September 1972, Simarloo sold 10 percent of its remaining Dairy Farm shares to raise funds for development. In December 1972, Simarloo sold over 40 percent of its remaining Dairy Farm shares, again to secure funds for development. Finally, in May 1973, Simarloo sold over 40 percent of its remaining Hong Kong shares to raise funds to pay off Simarloo's indebtedness to its shareholders.

At the time these sales were made, Simarloo was for the first time reaping harvests large enough to merit significant marketing efforts, and Simarloo's directors were deeply concerned with the question of how best to market Simarloo's

---

[24]See also *Datamation Services, Inc. v. Commissioner*, T.C. Memo. 1976–252, n. 9.

produce. Yet during this period, Simarloo sold over 80 percent of its holdings of Dairy Farm/Hong Kong Land stock, a course of action that hardly seems compatible with Simarloo's holding such stock primarily to guarantee itself a market for its produce.

The aforementioned pattern of sales suggest that by September 1971, Simarloo's dominant purpose in holding Dairy Farm shares was to provide a source of funds for the development of the company's business. This is not to say that Simarloo had no business reasons for holding the shares after September 1971; rather, we conclude that investment reasons predominated over business reasons by that time, and thereafter.[25] It follows that the Dairy Farm and Hong Kong Land Co. shares Simarloo sold in its fiscal year ended June 30, 1973, were capital assets, and that Simarloo's gain on the sale of such shares qualifies as foreign personal holding company income under section 553(a)(2).

## D. APPLICABILITY OF ALVORD DOCTRINE

We have determined that for its year ended June 30, 1973, Simarloo fit the statutory definition of a foreign personal holding company. Petitioners nevertheless contend, relying on case law that limits the application of the foreign personal holding company provisions, that, in spite of the clear language of the statute, LFG and IFTS should not be required to include in gross income section 551 constructive dividends in the amount of their pro rata shares of Simarloo's undistributed foreign personal holding company income.

Petitioners rely principally on *Alvord v. Commissioner*, 277

---

[25]Although we have found that Simarloo held its Dairy Farm shares predominately out of an investment motive, those shares would have been capital assets in Simarloo's hands as long as Simarloo had a substantial investment purpose for holding them, even though a business purpose was predominate. *W. W. Windle Co. v. Commissioner*, 65 T.C. 694, 712 (1976), appeal dismissed 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977); see also *Bell Fibre Products Corp. v. Commissioner*, T.C. Memo. 1977–42; *Bronner v. Commissioner*, T.C. Memo. 1983–91. In order to meet its burden of proof on this issue, therefore, petitioners would have to establish that Simarloo had no substantial investment purpose for holding Dairy Farm/Hong Kong Land shares in its fiscal year ended June 30, 1973.

F.2d 713 (4th Cir. 1960), revg. 32 T.C. 1 (1959).[26] In that case,[27] the taxpayer acquired, in 1951, a 95-percent interest in Hekor, a Canadian corporation that fit the statutory definition of a foreign personal holding company. Until 1955, Hekor's assets were subject to a tax lien, and under the control of the IRS. In 1951, 1953, and 1954, Hekor requested permission from the IRS to distribute to Alvord its foreign personal holding company income, and in each case permission was denied.

Alvord argued that the foreign personal holding company provisions were designed to force foreign personal holding companies to distribute their earnings to their U.S. shareholders, and urged that since Hekor was prevented by the IRS from distributing its earnings to him, Hekor should not be treated as a foreign personal holding company even though it fit the literal definition. We found for respondent (32 T.C. at 20), but the Fourth Circuit reversed, stating (277 F.2d at 719):

> In the light of the purpose of the statute, the evil at which it was directed and the revealing limitations of section 331(a)(2), we think that Congress intended the words "undistributed Supplement P net income," the measure of the tax upon the shareholders, to mean such income as was undistributed because of inaction of the "United States group." At least, it seems plain that it was not intended that those words should include income which was undistributed because the United States, through its Internal Revenue Service, exerted its power to prevent the act the statute was designed to compel.

Petitioners first argue that Simarloo falls under the rule of *Alvord* on the grounds that even if Simarloo had declared a dividend for its year ended June 30, 1973, it would have been

---

[26]Petitioners also cite *Gutierrez v. Commissioner*, 53 T.C. 394 (1969), affd. per curiam in an unreported case (D.C. Cir. 1971, 29 AFTR2d 72–358, 72–1 USTC par. 9121); *Miller v. Commissioner*, 43 T.C. 760 (1965); *Marsman v. Commissioner*, 18 T.C. 1 (1952), revd. in part 205 F.2d 335 (4th Cir. 1953), cert. denied 348 U.S. 943 (1955); and *Eder v. Commissioner*, 47 B.T.A. 235 (1942), remanded 138 F.2d 27 (2d Cir. 1943). In each of these cases the literal rules of the foreign personal holding company provisions were modified by judicial construction.

*Marsman* and *Gutierrez* held, under sec. 551(b), that the portion of the taxable income of a foreign personal holding company allocable to that part of its fiscal year during which its sole shareholder is a nonresident alien is not includable in the shareholder's gross income as undistributed foreign personal holding company income. In *Miller*, we held that stock in a foreign corporation held by two sisters who were nonresident aliens would not be attributed under sec. 333(a)(2), I.R.C. 1939 (the forerunner of sec. 554), to their brother, a U.S. citizen who owned no shares in the foreign corporation, for purposes of determining whether 50 percent of the stock of the foreign corporation was owned by a "U.S. group." These cases are distinguishable from the instant case. We discuss *Eder* in nn. 28 & 31, *infra*.

[27]*Alvord v. Commissioner*, 32 T.C. 1 (1959), revd. 277 F.2d 713 (4th Cir. 1960), was decided under the foreign personal holding company provisions of I.R.C. 1939, which are substantially similar to the present provisions.

unable to secure permission from the Reserve Bank of Australia to make a distribution to the U.S. shareholders.[28]

Both parties agree that Reserve Bank approval would have been required for any dividend distributions from Simarloo to the U.S. shareholders. Petitioners presented no evidence that such approval would have been withheld. Respondent's Australian law expert stated in his report that such approval would have been granted as a matter of course, and cited publications of the Reserve Bank to the same effect. We find that petitioners have failed to meet their burden of proof on this point.

Petitioners next contend that had the U.S. shareholders requested that Simarloo declare a dividend in the amount of its foreign personal holding company income for its fiscal year ended June 30, 1973, (1) AFIL, Simarloo's minority shareholder, would have wished to block such a dividend because declaring a dividend of such magnitude would have required Simarloo to dispose of large portions of its operating assets; and (2) AFIL would have had the power under Simarloo's articles of incorporation to prevent the declaration of such a dividend. Petitioners argue that given the truth of the foregoing contentions, the rule of *Alvord v. Commissioner*, *supra*, precludes us from finding that IFTS and LFG must include in income section 551(b) constructive dividends in the amounts of their pro rata shares of Simarloo's undistributed foreign personal holding company income for its fiscal year ended June 30, 1973.

In *Alvord*, Hekor was found not to be a foreign personal holding company on the ground that the IRS prohibited it from distributing its foreign personal holding company income. Neither Hekor nor its U.S. shareholder had any control over the IRS's decision to prevent Hekor from distributing its foreign personal holding company income.

---

[28]This scenario is closer to the facts of *Eder v. Commissioner, supra*, than to the facts of *Alvord v. Commissioner, supra*. In *Eder*, we held that the U.S. shareholders of a Colombian corporation that qualified as a foreign personal holding company must include in their gross incomes their pro rata shares of that corporation's undistributed foreign personal holding company income, despite the fact that currency restrictions imposed by the Colombian Government prevented the taxpayers from removing any dividends from Colombia. On appeal, the Second Circuit upheld our general conclusion, but held that the amount the taxpayers must include in gross income should be discounted to reflect the effect of the currency restrictions.

Even if we accept petitioners' assertion that the U.S. shareholders could not have forced a distribution of Simarloo's 1972–73 foreign personal holding company income, this case is very different from *Alvord*. Here, the U.S. shareholder's alleged inability to force a dividend arises from their having transferred to a foreign minority shareholder the power to block dividends, and not from any governmental action.[29]

In *Alvord*, the Fourth Circuit concluded that when five or fewer U.S. shareholders own more than 50 percent in value of the outstanding shares of a foreign corporation, those U.S. shareholders will be presumed to have the power to procure the distribution of the foreign corporation's earnings, assuming the IRS does not intervene to prevent the corporation from making a distribution.[30] This aspect of the Fourth Circuit's decision is consistent with our reasoning in *Alvord*, and we agree that when five or fewer U.S. citizens own more than 50 percent in value of the outstanding stock of a foreign corporation, those shareholders are presumed able to compel the declaration of a dividend. It follows that petitioners' reliance on the Fourth Circuit's decision in *Alvord*, is misplaced.[31] The

---

[29]The Fourth Circuit stated in *Alvord* (277 F.2d at 719) that "We need not now consider what the result might be if the failure to distribute all of the earnings of the foreign holding company was caused or influenced by restraints of private agreements."

[30]"The effect of the statute, of course, is to force the controlling United States shareholders to procure annual distributions of all of the * * * [foreign personal holding company] income of the holding company.

"Indeed, achievement of this effect, annual distributions in dividends of holding company net income, was the immediate purpose of the statute. Failure to make such distributions was the evil at which it was directed. Moreover, since the pressure of the tax could be exerted only upon United States shareholders, the statute was made inapplicable in situations in which the United States shareholders might be powerless to accomplish the desired distributions.

"Thus, by definition, the statute is made inapplicable if more than half of the outstanding shares are not owned by a 'United States group' consisting of not more than five individuals. Not unreasonably, it was supposed that so small a group of individuals, with identical interests because of the force of the statute, would be sufficiently cohesive that it could, and would, procure the desired annual distribution of the earnings of the holding company. * * * [277 F.2d at 718–719; fn. ref. omitted.]"

[31]As noted above, note 26, petitioners also rely on the Second Circuit's *Eder* opinion. That case, however, is distinguishable and provides no support to petitioners. In *Eder*, the foreign personal holding company was prevented by Government currency restrictions from expatriating Colombian currency to shareholders located in the U.S. The U.S. shareholders could not have arranged for the imposition of these currency restrictions in order to avoid the requirements of sec. 551(b). In the instant case, however, the U.S. shareholders transferred to AFIL Simarloo shares purportedly carrying the right to block dividends. It is conceivable that one of the reasons for the transfer was to avoid tax liability under sec. 551(b). Nothing in the Second Circuit's *Eder* opinion suggests that it would be willing to

Fourth Circuit's *Alvord* decision cannot be extended to situations in which a U.S. group owning more than 50 percent of a foreign corporation is prevented from forcing a dividend distribution by foreign shareholders,[32] because, as stated by the Fourth Circuit in *Alvord*, in such circumstances the U.S. group is presumed able to force a dividend distribution.[33]

Finally, petitioners contend that the legislative history of the foreign personal holding company provisions indicates that those provisions were enacted to prevent U.S. taxpayers from reducing their U.S. taxes by creating foreign incorporated pocketbooks, and argue that since Simarloo was an operating company and not a foreign incorporated pocketbook, we should not apply the foreign personal holding company rules to Simarloo. We need not inquire into the truth of the premises of this argument, because even if they are true, the conclusion sought by petitioners does not follow. Whatever evil Congress sought to prevent by passing the foreign personal holding company provisions, it chose to achieve its ends by erecting an unambiguous mechanical test for determining when a foreign corporation is a foreign personal holding company. Perhaps Congress could have achieved its ends by drafting a statute under which Simarloo would not qualify as a

apply a discount to the amount of undistributed foreign personal holding company income includable in gross income in cases in which a foreign personal holding company was prevented from distributing a dividend by a minority interest. We therefore need not in this case reconsider our holding in *Eder* in light of the Second Circuit's *Eder* decision.

[32]The foregoing discussion assumes that AFIL could, and would, have blocked a dividend distribution of Simarloo's foreign personal holding company income for its 1972–73 year. We have not found these assumptions to be facts; indeed, although our refusal to extend the holding of *Alvord* obviates the need for findings of fact on this point, we doubt that petitioners have met their burden of proving both of these assumptions.

[33]The Fourth Circuit's *Alvord* decision may be distinguished from the instant case in one other respect. In *Alvord*, Alvord and Hekor requested in 1951, 1953, and 1954, IRS's permission to declare dividends in the respective amounts of Hekor's estimated supplement P net income. 277 F.2d at 716–717. In this case, however, the U.S. shareholders made no attempt to cause Simarloo to declare any dividend for its fiscal year ended June 30, 1973, let alone a dividend in the amount of its foreign personal holding company income. To hold, as petitioners ask us to do, that sec. 551 is inapplicable if the counterfactual conditional "if we had tried to force the declaration of a dividend, we would have been unable to do so" is true, would be to undermine the workings of the purely mechanical tests set out in secs. 551 to 558. Were we to hold for petitioners on this issue, doubtless every taxpayer charged with income under sec. 551 would assert the aforementioned counterfactual conditional, and we would have to make a finding on the truth of such assertions. Nothing in the words of the statute justifies such a result.

This footnote does not imply that had the U.S. shareholders tried and failed to force Simarloo to distribute its fiscal year 1973 personal holding company income, they would have been immune from the reach of sec. 551, for we have held to the contrary above.

foreign personal holding company for its year ended June 30, 1973, but we must apply the law as it is written, not as petitioners believe it should have been written. *George Van Camp & Sons Co. v. American Can Co.*, 278 U.S. 245, 253 (1929);[34] *Warrensburg Board & Paper Corp. v. Commissioner*, 77 T.C. 1107, 1110-1111 (1981); *Eder v. Commissioner*, 47 B.T.A. 235, 239 (1942).

We hold that IFTS and LFG must include in income in their taxable years beginning May 1, 1973, section 551(b) constructive dividends in the amounts of their pro rata shares of Simarloo's undistributed foreign personal holding company income for its year ended June 30, 1973.

### Issue 2. Is a Section 551(b) Constructive Dividend a Dividend Within the Intendment of Section 543(a)(1)?

Personal holding company income includes that portion of adjusted ordinary gross income consisting of dividends. Sec. 543(a)(1). A U.S. shareholder of a foreign personal holding company must include in his gross income, "as a dividend," his pro rata share of undistributed foreign personal holding company income. Sec. 551(b).[35]

We have found that LFG and IFTS must include in gross income for their respective fiscal years beginning May 1, 1973, section 551(b) dividends from Simarloo, and such amounts evidently qualify as dividends under the intendment of section 543(a)(1). Petitioners, however, contend that amounts required to be included in gross income under section 551(b) are not necessarily dividends under the intendment of section

---

[34]"The contention is that the words must be confined to the particular line of commerce in which the discriminator is engaged, and that they do not include a different line of commerce in which purchasers from the discriminator are engaged in competition with one another. In support of this contention, we are asked to consider reports of Congressional committees and other familiar aids to statutory construction. But the general rule that 'the province of construction lies wholly within the domain of ambiguity' * * * is too firmly established by the numerous decisions of this Court either to require or permit us to do so. The words being clear, they are decisive. There is nothing to construe. To search elsewhere for a meaning either beyond or short of that which they disclose is to invite the danger, in the one case, of converting what was meant to be open and precise, into a concealed trap for the unsuspecting, or, in the other, of relieving from the grasp of the statute some whom the legislature definitely meant to include. [*George Van Camp & Sons Co. v. American Can Co.*, 278 U.S. 245, 253 (1929).]"

[35]We note that sec. 1.543–1(b), Income Tax Regs., is applicable only to taxable years beginning before Jan. 1, 1964.

543(a)(1). According to petitioners, we should adopt the rule that constructive dividends included in gross income under section 551 shall have the same character in the hands of their constructive recipient as they had in the hands of the foreign personal holding company that constructively distributed them.[36]

Petitioners rely on the following reasoning: (1) Any inconsistency between the foreign personal holding company provisions and the subsequently enacted provisions of subpart F should be resolved in favor of the latter, since they are indicative of the true congressional intent regarding the foreign personal holding company provisions (citing *Gutierrez v. Commissioner*, 53 T.C. 394 (1969), affd. per curiam in an unreparted case (D.C. Cir. 1972, 29 AFTR 2d 72–358, 72–1 USTC par. 9121; (2) section 951(a)(1) provides that the U.S. shareholder of a controlled foreign corporation shall include in gross income its pro rata share of the controlled foreign corporation's subpart F income, plus certain other amounts not relevant here. Section 951 does not characterize amounts so includable in income as dividends, and the regulations provide that for purposes of section 542, the character of amounts includable in gross income under section 951 is determined as if such amounts were realized directly from the sources from which they were realized by the controlled foreign corporation. Sec. 1.951–1(a)(iii), Income Tax Regs.;[37] (3) section 951(a)(1) as interpreted by section 1.951–1(a)(2)(iv), Income Tax Regs , is inconsistent with section 551(b) and, therefore, the rule of section 551(b) should be replaced by the "pass through" approach of section 951(a)(i) as interpreted by section 1.951–1(a)(iii), Income Tax Regs., to determine whether

---

[36]If we follow petitioners' suggestion, the sec. 551(b) dividends included in income by IFTS would consist almost entirely of gain from the sale of securities constituting capital assets. Under sec. 543, personal holding company income does not include gain·from the sale of capital assets. According to petitioners, following their suggestion would thus eliminate IFTS's personal holding company income, and IFTS would not qualify as a personal holding company under sec. 542.

[37]"For purposes of determining whether a United States shareholder which is a domestic corporation is a personal holding company under section 542 and section 1.542–1, the character of the amount includible in gross income of such domestic corporation under this paragraph shall be determined as if such amount were realized directly by such corporation from the source from which it is realized by the controlled foreign corporation. * * * [Sec. 1.951–1(a)(2)(iv), Income Tax Regs.]"

amounts includable in income by LFG and IFTS as dividends pursuant to section 551(b) constitute personal holding company income.

Silvio Gutierrez became a resident alien on March 1, 1961, and remained such through December 31, 1961. His foreign personal holding company operated on a fiscal year ended August 31, 1961. Under the literal language of section 551(b), Gutierrez was taxable upon his foreign personal holding company's undistributed foreign personal holding company income for its entire taxable year.

We held that only that portion of the taxable income of Gutierrez's foreign personal holding company allocable to the portion of its fiscal year during which Gutierrez was a resident alien was includable in his 1961 gross income. In reaching this result, we considered section 951(a)(2)(A), the subpart F provision analogous to section 551(b), which mandated for purposes of subpart F the result sought by Gutierrez under section 551(b), and stated that (53 T.C. at 399):

Since section 951 was enacted to serve a purpose under the controlled foreign corporation provisions substantially identical to that served by section 551 under the foreign personal holding company provisions, we believe section 951(a)(2)(A) offers a strong indication of how Congress intended section 551(b) to operate.

It is this language upon which petitioners rely.

We believe that the above-cited language relied upon by petitioners cannot be extended to the facts at hand.

Our holding in *Gutierrez* is based on a careful reading of the relevant statutory language. We first noted that section 551(b) would have required an allocation of the income of Gutierrez's foreign personal holding company if Gutierrez had been a resident alien prior to March 1, 1961, and a nonresident alien thereafter (53 T.C. at 397). We further noted that the provision that required Gutierrez to include in his income his foreign personal holding company's income for its entire taxable year was designed to avoid the problem of allocating a taxable year's earnings to various shareholders when shares of a foreign personal holding company have changed hands during a taxable year (53 T.C. at 397). We concluded that Gutierrez had "been snared in statutory language directed not at newly arrived resident aliens, but rather at a situation where the shares have changed hands." (53 T.C. at 398.)

Our analysis of the statute led us to conclude that applying the literal words of section 551(b) to Gutierrez would reach an unreasonable result plainly at variance with the policy of the legislation as a whole. We then declined to apply the literal language of section 551(b) to Gutierrez on the authority of *United States v. American Trucking Associations*, 310 U.S. 534 (1940).[38]

Section 543(a)(1) categorically states that dividends are personal holding company income, and section 551(b) explicitly defines constructive distributions of undistributed foreign personal holding company income as dividends. Unlike the situation in *Gutierrez*, the relevant statutory language is in no way limited by or at cross purposes with any other foreign personal holding company provision. Furthermore, petitioners have not shown that applying the clear language of these sections leads to unreasonable results plainly at variance with the policy of the legislation as a whole.[39] In these circum-

---

[38]We relied on the following passage, *United States v. American Trucking Associations*, 310 U.S. 534, 543-544 (1940):

"There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When the meaning has led to absurd or futile results, however, this Court has looked beyond the words of the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' [Fn. refs. omitted.]"

[39]The legislative history indicates that the purpose of the foreign personal holding company provisions was to prevent taxpayers from using foreign personal holding companies to reduce their taxes:

"Title II of the bill deals with foreign personal holding companies. The evidence presented to the joint committee has shown *that foreign personal holding companies have afforded one of the most flagrant loopholes for tax avoidance*. The use of such corporations has greatly increased within the last few years. Unless immediate preventive measures are taken increased loss of revenue will be suffered in the future. Therefore, this subject has received special attention by your committee. On account of lack of direct jurisdiction over such companies, substantial difficulties have been encountered. Your committee is of the opinion that it is justifiable on all grounds, including constitutional grounds, to provide for a method of taxation which will reach the shareholders who own stock in such companies and over whom the United States has jurisdiction. A new method of taxation is therefore proposed under the bill which treats the income of the foreign corporate entity as the income of the shareholders within the jurisdiction of the United States and requires them to report as their income the undistributed net income of such foreign personal holding companies. [S. Rept. 1242, 75th Cong., 1st Sess. (1937), 1939-1 C.B. (Part 2) 713; emphasis supplied.]"

stances, *Gutierrez* and subpart F simply provide no authority for refusing to apply sections 551(b) and 543(a)(1) as they are written. It follows that section 551(b) dividends includable in gross income by LFG and IFTS were dividends under the intendment of section 543(a)(1).

### Issue 3. May Corporate Taxes of LFG and IFTS That Were Neither Paid Nor Recognized Be Deducted Pursuant to Section 545(b)(1)?

Section 545(b)(1) allows a deduction in computing undistributed personal holding company income for Federal income taxes accrued during the taxable year.[40] In computing the amount of taxes accrued in a taxable year, an unpaid tax that is contested is not considered accrued until the contest is resolved. Sec. 1.545–2(a)(1), Income Tax Regs.[41] This regulation reflects the legislative history of the 1954 amendment of the personal holding company provisions, in which it is stated that "In the case of contested taxes the accrual occurs in the year the contest is resolved. (*Dixie Pine Products Co. v. Commission-*

---

See also *Eder v. Commissioner*, 47 B.T.A. at 239–240. Treating sec. 551(b) dividends as dividends under the intendment of sec. 543(a)(1) is in no way at variance with the statute's avowed policy of preventing tax avoidance.

[40]SEC. 545(b). ADJUSTMENTS TO TAXABLE INCOME.—For the purposes of subsection (a), the taxable income shall be adjusted as follows:

(1) TAXES.—There shall be allowed as a deduction Federal income and excess profits taxes and income, war profits and excess profits taxes of foreign countries and possessions of the United States (to the extent not allowable as a deduction under section 275(a)(4)), accrued during the taxable year or deemed to be paid by a domestic corporation under section 902(a) or 960(a)(1) for the taxable year, but not including the accumulated earnings tax imposed by section 531, the personal holding company tax imposed by section 541, or the taxes imposed by corresponding sections of a prior income tax law.

[41](a) TAXES.—(1) *General rule.* (i) in computing undistributed personal holding company income for any taxable year, there shall be allowed as a deduction the amount by which Federal income and excess profits taxes accrued during the taxable year exceed the credit provided by section 33 (relating to taxes of foreign countries and possessions of the United States), and the income, war profits, and excess profits taxes of foreign countries and possessions of the United States accrued during the taxable year (to the extent provided by subparagraph (3) of this paragraph), except that no deduction shall be allowed for (*a*) the accumulated earnings tax imposed by section 531 (or a corresponding section of a prior law), (*b*) the personal holding company tax imposed by section 541 (or a corresponding section of a prior law), and (*c*) the excess profits tax imposed by subchapter E, chapter 2 of the Internal Revenue Code of 1939, for taxable years beginning after December 31, 1940. The deduction is for taxes for the taxable year, determined under the accrual method of accounting, regardless of whether the corporation uses an accrual method of accounting, the cash receipts and disbursement method, or any other allowable method of accounting. In computing the amount of taxes accrued, an unpaid tax which is being contested is not considered accrued until the contest is resolved. [Sec. 1.545–2(a)(1), Income Tax Regs.]

*er*, 320 U.S. 516.)" H. Rept. 1337, 83d Cong., 2d Sess., reprinted in 1954 U.S. Code Cong. & Adm. News 4316.[42]

We have found that LFG and IFTS must include in income in their fiscal years beginning May 1, 1973, section 551(b) constructive dividends, and that these constructive dividends are personal holding company income. Neither corporation ever reported or paid corporate income tax attributable to such dividends.

Respondent calculated LFG and IFTS's personal holding company tax for their fiscal years beginning May 1, 1973, without allowing deductions for corporate income tax attributable to section 551(b) constructive dividends includable in income by LFG and IFTS. Petitioners contend that such deductions should have been allowed, either on the authority of cases holding that for purposes of computing earnings and profits, contested tax deficiencies are deductible for the year to which the deficiency relates;[43] or on the ground that since LFG and IFTS ceased to exist before respondent issued deficiency notices in this case, LFG and IFTS cannot be said to have contested their corporate tax liabilities for their taxable years beginning May 1, 1973.[44]

Petitioners correctly point out that a number of cases hold that an accrual basis taxpayer's true tax liability must be considered for purposes of calculating earnings and profits, whether or not the taxpayer is aware of, or agrees to, such liability. *Estate of Stein v. Commissioner*, 25 T.C. 940, 966 (1956), affd. sub nom. *Levine v. Commissioner*, 250 F.2d 798 (2d Cir. 1958); see also *Drybrough v. Commissioner*, 23 T.C. 1105 (1955), remanded on another issue 238 F.2d 735, 739 (6th Cir. 1956). Petitioners contend that we should adopt this rule for determining whether LFG and IFTS may deduct from their undistributed personal holding company income corporate taxes attributable to section 551(b) dividends includable in

---

[42]Cf. also S. Rept. 1622, 83d Cong., 2d Sess., reprinted in 1954 U.S. Code Cong. & Adm. News 4960–4961.

[43]Petitioners thus ask us to invalidate sec. 1.545–2(a)(1), Income Tax Regs.

[44]This argument was considered and rejected in *Hart Metal Products Corp. v. Commissioner*, 437 F.2d 946, 953 n. 18 (7th Cir. 1971), and in *LX Cattle Co. v. United States*, 629 F.2d 1096, 1098 n. 3 (5th Cir. 1980).

income in their taxable years beginning May 1, 1973, but never recognized or paid.

Petitioners point out that the personal holding company provisions were intended to force personal holding companies to distribute their personal holding company income, and argue that if contested corporate taxes may not be accrued in the year to which they are attributable, a personal holding company may have more personal holding company income than it has funds available to distribute. They conclude that the rule of *Estate of Stein v. Commissioner, supra,* is more in keeping with the purpose of the personal holding company provisions than is the rule of section 1.545–2(a)(1), Income Tax Regs.

Petitioners recognize that the congressional purpose as stated in the above-cited legislative history contradicts their argument, but urge us to ignore that legislative history as an improper attempt to reinterpret the foreign personal holding company provisions enacted in 1937.

Section 505(a)(1) of the Internal Revenue Code of 1939, the predecessor of section 545(b)(1), provided in pertinent part:

SEC. 505(a). ADDITIONAL DEDUCTIONS.—There shall be allowed as deductions—

(1) Federal income, * * * taxes paid or accrued during the taxable year * * *

This language led to uncertainty as to when unpaid income taxes are properly deductible. See, e.g., *Lemp Brewing Co. v. Commissioner,* 18 T.C. 586 (1952); *Joan Carrol Corp. v. Commissioner,* 13 T.C. 83 (1949), revd. 180 F.2d 751 (2d Cir. 1950); *Alworth v. Commissioner,* 38 B.T.A. 656 (1938).

In 1954, Congress amended the above clause to read in pertinent part: "There shall be allowed as a deduction * * * Federal income * * * taxes * * * accrued during the taxable year." (Sec. 545(b)(1).) By so acting, Congress intended to amend the personal holding company provisions to clarify the deductibility of Federal income taxes. The reference in the legislative history to *Dixie Pine Products Co. v. Commissioner,* 320 U.S. 516 (1944), establishes that Congress meant to exclude contested taxes from the class of taxes accruable under the intendment of section 545(b)(1). *LX Cattle Co. v. United States,* 629 F.2d 1096, 1098 (5th Cir. 1980). *Hart Metal Products Corp. v. Commissioner,* 437 F.2d 946, 952–953 (7th

Cir. 1971), affg. a Memorandum Opinion of this Court. In the face of such an expression of congressional intent, we could hold for petitioners on this question only by arrogating to ourselves the power to amend section 545(b)(1). This we may not do. We hold that section 1.545-2(a)(1), Income Tax Regs., is a valid interpretation of section 545(b)(1).

Petitioners argue in the alternative that section 1.545-2(a)(1) is inapplicable to LFG and IFTS. According to petitioners, the corporate tax liabilities attributable to section 551(b) constructive dividends included in income by LFG and IFTS are not contested liabilities for purposes of applying section 545(b)(1) to LFG and IFTS since both corporations went out of existence before the Commissioner issued the deficiency notices contested in this case, and therefore did not contest those deficiency notices.

To support their position, petitioners rely on *Lutz v. Commissioner*, 396 F.2d 412 (9th Cir. 1968), revg. 45 T.C. 615 (1966), in which the Ninth Circuit, the circuit to which this case is appealable, held that "a 'contest' requires a formal, direct challenge to the substance of the asserted liability, and * * * a taxpayer does not engage in a contest where he merely abides the outcome of litigation or protests prosecuted by others." (396 F.2d at 415.)

The foregoing language from *Lutz v. Commissioner, supra,* provides superficial support for petitioners' position, but on a careful reading that case is of no help to petitioners.

The taxpayers in *Lutz* were members of a partnership that engaged in the construction of military housing in Washington State. Partnership construction projects were awarded under the Capehart Act of 1955. (42 U.S.C. sec. 1594.) Several Capehart contractors other than the taxpayers brought suit in State court to challenge Washington's tax on the sale of houses constructed under Capehart contracts. The taxpayers were not a party to any such suit. During the pendency of such suits, Washington notified the taxpayer's partnership that collection of the State tax would be held in abeyance until conclusion of the litigation, but the partnership was required to file returns. Because of this administrative action by the State of Washington, the partnership did not pay the tax in question in 1960 or 1962. In 1964, the aforementioned litigation was finally concluded in favor of the State of Washington; shortly thereaf-

ter, the partnership paid all its assessed Washington taxes for 1960 and 1962. The Commissioner refused to allow the partnership to deduct its Washington State tax in its 1960 and 1962 tax years, contending that the liability did not accrue until 1964. The Ninth Circuit rejected this position:

> We can find no authority (and we have been cited to none) for the proposition that a third party's contest of liability makes a taxpayer's similar liability contingent. We recognize the fact that if the contestant is successful in voiding a tax the taxpayer might later be able to recoup his payment or avoid that liability. Such a possibility, we feel, is too remotely connected with the taxpayer to describe the liability as contingent. [396 F.2d at 414.]

Instead, the Ninth Circuit adopted the reasoning of *Dravo Corp. v. Commissioner*, 172 Ct. Cl. 200, 348 F.2d 542 (1965), citing the following passage from *Dravo* (348 F.2d at 545–546):

> If a departure from the traditional concepts of proper accrual tax accounting is required by the fact of contest, it should be evidenced by taxpayer's objective acts; i.e., lodging a formal protest with the tax authorities or instituting a suit in a court of law. To conclude otherwise would ignore the principle of an uncontested tax, and equate actual contest with acquiescence without contest. But more important, in order that income may be clearly reflected for any taxable year, it is necessary to reflect the state tax liabilities for that year. When the liability is not disputed and the precise amount is later determined, it is in accordance with sound principles of accounting that the tax accrue in the year in which the liability occurred. [396 F.2d at 414.]

These two passages suggest that the Ninth Circuit believed that the "contested liability" exception to normal accrual tax accounting should be invoked as to a liability only when that particular liability is contested.

In the case before us, petitioners ask that LFG and IFTS's corporate tax liabilities be accrued in their fiscal years beginning May 1, 1973, even though those corporate tax liabilities were never acknowledged by LFG or IFTS, and are contested by their successors in interest in this very case. Under these circumstances, we conclude that the principles of proper tax accrual accounting that were the basis of the Ninth Circuit's opinion in *Lutz v. Commissioner, supra,* entail that LFG and IFTS's corporate tax liabilities attributable to section 551(b) constructive dividends includable in income in their fiscal years beginning May 1, 1973, are contested liabilities

under the intendment of section 1.545–2(a)(1), Income Tax Regs.

### Issue 4. Did the Merger of IFTS Into MFF Qualify as an F Reorganization?

An F reorganization is a corporate reorganization that effects a mere change in identity, form, or place of organization. Sec. 368(a)(1)(F). When one corporation acquires the assets of another pursuant to the provisions of section 332,[45] or subparagraphs (A), (C), (D), (F), or (G) of section 368(a)(1), the acquiring corporation succeeds to certain specified tax attributes of the acquired corporation. Sec. 381(a). Generally, the acquiring corporation may not carry back a net operating loss from a taxable year ending after the date of the acquisition to a preacquisition taxable year of the acquired corporation. Such a carryback is permitted, however, if the acquisition qualifies as an F reorganization. Sec. 381(b)(3).

Petitioners contend that the merger of IFTS into MFF qualifies as an F reorganization, and that MFF is therefore entitled to carry back its net operating loss to IFTS's preacquisition gain. Respondent takes the position that the merger of IFTS into MFF does not qualify as an F reorganization.

The F reorganization was introduced into the Internal Revenue Code in 1921, when it was defined as a "mere change in identity, form or place of organization of a corporation." (Sec. 202(c) of the Revenue Act of 1921.) As we have previously noted, *Estate of Stauffer v. Commissioner*, 48 T.C. 277, 299 (1967), revd. 403 F.2d 611 (9th Cir. 1968): "When this definition was reenacted in otherwise identical language in the Revenue Act of 1924, the last three words were dropped. But there was no indication whatever that the deletion was intended to have any significance." Following what we perceive to be the clear meaning of the statute, we have consistently held that F reorganization treatment is appropriate only for the reorganization of a single corporation, and may not be extended to a combination of two or more operating corporations. *Stauffer* v. *Commissioner, supra; Romy Hammes, Inc. v. Commissioner*, 68

---

[45]Except in a case in which the basis of the assets distributed is determined under sec. 334(b)(2).

T.C. 900 (1977); *Berger Machine Products, Inc. v. Commissioner*, 68 T.C. 358 (1977); *Eastern Color Printing Co. v. Commissioner*, 63 T.C. 27 (1974); *Associated Machine Corp. v. Commissioner*, 48 T.C. 318 (1967), revd. 403 F.2d 622 (9th Cir. 1968).[46]

The Ninth Circuit Court of Appeals, to which appeal in this case would lie, has adopted an interpretation of section 368(a)(1)(F) more liberal than ours. In *Stauffer v. Commissioner, supra,* the Ninth Circuit held that the merger into a shell corporation of three operating corporations, all owned by one individual, and all engaged in the business of selling mechanical posture and weight control devices that were manufactured by two of the corporations, qualified as an F reorganization. In reaching this result, the Ninth Circuit enunciated the following principle: "a shift in operating assets from the transferor corporation to its alter ego wherein the identity of the proprietary interest remains intact and the business enterprise of the transferor corporation continues unimpaired results in an 'F' reorganization. There is a change of corporate vehicles but not a change in the substance of the transferor corporation." (403 F.2d at 619.) In applying this principle to the facts before it, the court stressed that the businesses of the three transferor corporations continued unimpaired after the merger.[47]

*Associated Machine Corp. v. Commissioner, supra,* involved a merger of two commonly owned operating companies that had the same officers and directors and integrated businesses. The business operations of the two corporations continued unchanged after the merger. The Commissioner argued that F reorganizations are limited to formalistic changes in the charter or place of organization of a single corporation, but the Ninth Circuit disagreed, stating that (403 F.2d at 624):

---

[46]We note that Congress has recently amended sec. 368(a)(1)(F) to read as follows (applicable to transactions occurring after Aug. 31, 1982): "a mere change in identity, form, or place of organization of one corporation, however effected." Tax Equity and Fiscal Responsibility Act of 1982, sec. 225, Pub. L. 97–248, 96 Stat. 324, 490.

[47]"In the instant case, the only change that took place was that Stauffer New Mexico reported the combined income of the three pre-merger corporations in one tax return; the individual books of the constituent enterprises were kept as they had been before the merger; the enterprises continued to operate in the same manner and at the same locations as before the merger; the change was one of corporate vehicles only. [403 F.2d at 619.]"

No logical distinction exists between a "shell receiver" and an "active receiver" when two factors co-exist: one, when the proprietary interest in the transferor and transferee is identical; and two, when the business is not interrupted.

The court concluded that the merger in issue did qualify as an F reorganization.

The foregoing quotations indicate that it is the rule in the Ninth Circuit that a merger may qualify as an F reorganization only if proprietary interest is unchanged by the merger[48] and the business of the transferor corporation continues unchanged after the merger.[49]

On the facts of this case, we find it unnecessary to decide whether we are bound by the rule of *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971), because we are satisfied that the merger of IFTS into MFF does not qualify as an F reorganization under the rule of the Ninth Circuit.

Prior to its merger into MFF, the sole business of IFTS was holding Simarloo shares. On November 5, 1973, one month prior to the merger, IFTS entered into an agreement to sell its Simarloo shares to ADF, a subsidiary of Dairy Farm. On December 18, 1973, MFF sold the Simarloo shares it received from IFTS to the Mariani Hong Kong Trust in an installment sale. MFF received no payments from the Mariani Trust during its fiscal year ended April 27, 1974. On January 11, 1974, the trust sold the Simarloo shares to ADF for the amount specified in the agreement of November 5, 1973.

Following the merger of IFTS into MFF, the business of IFTS did not continue unimpaired. MFF did not retain IFTS's

[48]This strict requirement has subsequently been relaxed in certain circumstances by another circuit, *Aetna Casualty & Surety Co. v. United States*, 568 F.2d 811 (2d Cir. 1976), and it may be that the Ninth Circuit would no longer require in all circumstances an identity of proprietary interests before and after a merger. But see *Security Industries Insurance Co. v. United States*, 702 F.2d 1234 (5th Cir. 1983).

[49]This requirement has been adopted by several other circuits:

"we hold that *Davant* establishes criteria which adequately define when a reorganization qualifies as a mere change in form, identity, or place of incorporation. These include * * * unimpaired continuity of the essential business enterprise and a new form which is the alter ego of the old. [*Home Construction Corp. of America v. United States*, 439 F.2d 1165, 1170 (5th Cir. 1971).]"

"It is clear that 'F' status cannot be had unless there is a continuation of the business enterprise. * * * [*Movielab, Inc. v. United States*, 204 Ct. Cl. 6, 18, 494 F.2d 693, 699 (1974).]"

Simarloo shares, nor did it hold the cash proceeds from the sale of those shares. MFF held only a contractual right to future payments from the Mariani Trust; indeed, if any party herein can be said to have succeeded to the business enterprise of IFTS, it is the Mariani Trust, since that trust held and received the income from the proceeds of the sale of IFTS's Simarloo shares.

Under the rule stated by the Ninth Circuit, since the business of IFTS was not continued by MFF following the merger of IFTS and MFF,[50] that merger does not qualify as an F reorganization.[51]

## Issue 5. IFTS Dividends Paid Deduction

A personal holding company that adopts a plan of complete liquidation and completely distributes its assets within 2 years of the adoption of such plan may treat as a dividend, for purposes of computing the dividends paid deduction, the amount of such distribution, to the extent distributed to corporate distributees in their allocable share of the liquidating corporation's undistributed personal holding company income for the taxable year of distribution. Sec. 562(b).

If a personal holding company distributes property other than cash as a dividend, its dividends paid deduction is limited to its adjusted basis in the property when distributed. Sec. 1.562–1(a), Income Tax Regs.[52]

Section 551(d) provides:

An amount which bears the same ratio to the undistributed foreign personal holding company income of the foreign personal holding company for its

---

[50]We do not mean to imply that had the business of IFTS been continued by MFF we would necessarily have held that the merger qualifies as an F reorganization under the rule of the Ninth Circuit.

[51]On the facts of this case, even if the merger of IFTS and MFF were an F reorganization, MFF would not be entitled to carry back its net operating losses to offset IFTS's preacquisition income, because those net operating losses did not arise out of the continuation of IFTS's business. "[E]ven where an (F) reorganization is present, the section 381 carrybacks may only be used to offset income generated by the same business unit or division that sustained the loss." *Romy Hammes, Inc. v. Commissioner,* 68 T.C. 900, 910 (1977); see also *Home Construction Corp. of America v. United States,* 439 F.2d 1165, 1172 (5th Cir. 1971): "only such portion of the overall loss as can be shown to be attributable to each respective separate division within the new structure may be carried back, and then only be offset against gains of such division's premerger counterpart."

[52]This regulation has been held valid. *Fulman v. United States,* 434 U.S. 528 (1978).

taxable year as the portion of such taxable year up to and including the last day on which a United States group existed with respect to the company bears to the entire taxable year, shall, for the purpose of determining the effect of distributions in subsequent taxable years by the corporation, be considered as paid-in surplus or as a contribution to capital, and the accumulated earnings and profits as of the close of the taxable year shall be correspondingly reduced, if such amount or any portion thereof is required to be included as a dividend, directly or indirectly, in the gross income of United States shareholders.

Section 551(e) provides:

The amount required to be included in the gross income of a United States shareholder under subsection (b) shall, for the purpose of adjusting the basis of his stock with respect to which the distribution would have been made (if it had been made), be treated as having been reinvested by the shareholder as a contribution to the capital of the corporation; but only to the extent to which such amount is included in his gross income in his return, increased or decreased by any adjustment of such amount in the last determination of the shareholder's tax liability, made before the expiration of 6 years after the date prescribed by law for filing the return.

On December 4, 1973, IFTS distributed its assets, consisting of shares of Simarloo stock, to MFF pursuant to a plan of complete liquidation. The parties agree that the merger of IFTS into MFF qualifies as a complete liquidation within the intendment of section 332, and that IFTS is entitled to a dividends paid deduction with respect to that distribution in the amount of its basis in the distributed Simarloo shares.[53] Respondent contends IFTS's basis in its Simarloo shares at the time of the aforementioned distribution was $114,448.85, IFTS's basis in its Simarloo shares prior to its receipt of a constructive dividend under section 551(b). Petitioners contend that IFTS had a basis in its Simarloo shares of $774,777.85, or $114,448.85 increased under section 551(e) by $630,329, the amount of the constructive dividend from Simarloo attributed to IFTS under section 551(b).

Respondent advances the following argument to support his position: section 551(e) is a corollary of section 551(d); section 551(d) provides that the amount of the section 551(b) distribution "shall, for the purpose of determining the effect of

---

[53]Respondent also conceded that the cash liquidating distributions made by LFG in 1974 and 1975 are deductible under sec. 561 to the extent such distributions were treated as dividends by the individuals and trusts that received them.

distributions in subsequent taxable years by the corporation, be considered as * * * a contribution to capital;" therefore, section 551(e) provides for an increase in a corporation's basis in its shares in a foreign personal holding company only for taxable years subsequent to the taxable year in which it includes in income a section 551(b) constructive dividend. Relying on this argument, respondent concludes that IFTS's basis in its Simarloo shares could have been increased under section 551(e) only for years following the end of IFTS's taxable year that began May 1, 1973.

A section 551(b) constructive dividend is includable in income by its deemed recipient during the recipient's taxable year with which or during which ends the taxable year of the foreign personal holding company with respect to which the deemed distribution occurs. Sec. 551(b).

Examples (1) and (2) of section 1.551–5(b), Income Tax Regs.,[54] indicate that when the taxable year of the recipient of a section 551(b) constructive dividend is the same as the taxable year of the distributing foreign personal holding company, both section 551(d) and (e) are applicable on the same date—the day on which ends the taxable years of the foreign personal holding company and its U.S. shareholder.

In cases where the taxable year of the recipient of a section 551(b) constructive dividend differs from that of the foreign personal holding company, the parties agree that section 551(d) takes effect at the end of the foreign personal holding company's taxable year. In such cases, however, respondent reads section 551(e) as taking effect not at the end of the foreign personal holding company's taxable year, but at the

---

[54]*Example (1).* The M Corporation is a foreign personal holding company. Seventy-five percent in value of its capital stock is owned by A, a citizen of the United States, and the remainder, or 25 percent, of its stock is owned by B, a nonresident alien individual. For the calendar year 1954 the M Corporation has an undistributed foreign personal holding company income of $100,000. A is required to include $75,000 of such income in gross income as a dividend in his return for the calendar year 1954. The $100,000 is treated as paid-in surplus or as a contribution to the capital of the M Corporation and its accumulated earnings and profits as of the close of the calendar year 1954 are correspondingly reduced. * * *

*Example (2).* In example (1) assume the basis of A's stock to be $300,000. If A includes in gross income in his return for the calendar year 1954, $75,000 as a dividend from the M Corporation, the basis of his stock would be $375,000. * * *

[Sec. 1.551–5(b), Income Tax Regs.]

end of the taxable year of the recipient of the section 551(b) constructive dividend.[55]

Respondent's contention that the section 551(e) increase in basis properly occurs at the end of the taxable year of the recipient of the section 551(b) constructive dividend, rather than at the end of the taxable year of the foreign personal holding company with respect to which such a distribution occurs, is not supported by the statutory language and, if adopted, would lead to results contrary to those intended by Congress when it enacted the predecessor of section 551(e).

The legislative history of section 551(e) provides:

This is a corollary to the proposed rule in section * * * [551(d)]. It is provided that the amount of the undistributed * * * [foreign personal holding company] income required to be included in the gross income of United States shareholders should be added to the basis of their shares and be treated as having been remitted by the shareholder as a contribution to the capital of the company. [S. Rept. 1242, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 719.]

Congress evidently intended to prevent double taxation in the event that a holder of shares in a foreign personal holding company disposed of such shares after having included in income a section 551(b) constructive dividend. In other words, section 551(e) was intended as an extension of the normal tax accounting rule that a taxpayer who makes a contribution to capital of a corporation in which he owns stock is entitled to increase his basis in such stock in the amount of his contribution to capital, at the time of such contribution.[56] In order to effectuate congressional intent, the section 551(e) basis increase must occur at the same time as the section 551(d)

---

[55]Respondent's reading of sec. 551(e) leads to an incongruous result in the case in which a foreign personal holding company has one U.S. shareholder with the same taxable year as the foreign personal holding company, and another with a taxable year ending later. On the last day of the foreign personal holding company's taxable year, each of the U.S. shareholders will receive a sec. 551(b) deemed distribution of its ratable share of the foreign personal holding company's undistributed foreign personal holding company income. According to respondent, the U.S. shareholder with the same taxable year as the foreign personal holding company would increase its basis in its stock in the amount of the sec. 551(b) distribution on the day of the deemed distribution, but the U.S. shareholder whose taxable year differed from that of the foreign personal holding company would not—it could not claim a sec. 551(e) basis increase until the end of its taxable year.

[56] Contributions to capital "represent an additional price paid for the shares of stock held by the individual shareholders." Sec. 1.118–1, Income Tax Regs. See *International Trading Co. v. Commissioner*, T.C. Memo. 1958–104, affd. 275 F.2d 578 (7th Cir. 1960).

deemed contribution to capital of the foreign personal holding company; namely, at the end of the taxable year of the foreign personal holding company with respect to which it is deemed to have distributed a dividend under section 551(b).

A section 551(e) basis increase is available only to the extent that a shareholder includes in gross income the section 551(b) constructive dividend with respect to which the section 551(e) increase in basis is claimed, increased or decreased by adjustments of such section 551(b) dividends in the last determination of the shareholder's tax liability made before the expiration of 6 years after the date prescribed by law for filing the return. Congress included this clause in section 551(e) to ensure that a U.S. corporation would increase its basis in its shares in a foreign personal holding company if and only if it were required to include in income a constructive dividend under section 551(b).[57]

The parties agree that respondent's adjustments to IFTS's gross income attributable to the section 551(b) constructive dividend from Simarloo was made within 6 years of the date prescribed by law for the filing of IFTS's return for its taxable year beginning May 1, 1973. It follows that respondent's adjustment in IFTS's gross income, which we uphold in this case, qualifies as the last determination of IFTS's tax liability made before the expiration of 6 years after the date prescribed by law for filing the return.[58] We hold that IFTS's basis in its Simarloo stock was increased as of June 30, 1973, in the

---

[57] "The application of the rule is illustrated as follows: In the example given under (e) assume the basis of A's stock to [be] $300. If A takes up $75 as a constructive dividend in 1937 the basis of his stock would be $375. When the $75 is distributed tax-free, A's basis, assuming no other changes, would again be $300. If A failed to include the $75 as required by law and his failure was not discovered until after the 7-year statute of limitations had expired, the application of the rule would not increase the basis of A's stock. The subsequent tax-free distribution of $75 would reduce his basis to $225, thus tending to compensate for his failure to report the amount of $75 in his gross income. If the Commissioner should readjust the undistributed * * * [foreign personal holding company] income of the company within the statutory period, thus increasing or decreasing the amount A should have reported, proper adjustment would be made. Moreover, this rule as to adjustment of the shareholder's basis applies even though the shareholder has sold his stock and reported a capital gain in gross income in a taxable year prior to the year in which he is required to include in gross income his distributive share of the undistributed * * * [foreign personal holding] income of the company. In some cases such adjustment may entitle the shareholder to a refund with respect to such prior year. [S. Rept. 1242, *supra*, 1939–1 C.B. (Part 2) at 719.]"

[58] Had we agreed with petitioners that IFTS received no sec. 551(b) constructive dividend

amount of its section 551(b) constructive dividend from Simarloo.

### Issue 6. Is Respondent's Assessment
### Against the Transferees of LFG
### Barred by the Statute of Limitations?

Section 6501(e)(1) provides:

INCOME TAXES.—In the case of any tax imposed by subtitle A—

(A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—

(i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and

(ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

(B) CONSTRUCTIVE DIVIDENDS.—If the taxpayer omits from gross income an amount properly includible therein under section 551(b) (relating to the inclusion in the gross income of United States shareholders of their distributive shares of the undistributed foreign personal holding company income), the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed.

On June 29, 1979, respondent mailed notices of deficiency to the transferees of LFG, asserting that they were liable for various portions of the deficiencies assessed against LFG for its taxable years ended April 30, 1974, and April 30, 1975. We have found that LFG omitted from gross income in its aforementioned taxable years an amount properly includable therein under section 551(b). It thus appears that section

---

in its taxable year beginning May 1, 1973, respondent's determination that IFTS had received such income would have been nullified, and IFTS would not have been entitled to an increase in basis of its Simarloo shares under sec. 551(e).

6501(e)(1)(B) allows respondent 6 years after the filing of LFG's return to assert deficiencies against LFG's transferees.[59] Petitioners contend, however, that we should read into section 6501(e)(1)(B) the limitation expressed in section 6501(e) (1)(A)(ii).

Petitioners' contention faces a large problem at the outset— Congress could easily have added to section 6501(e)(1)(B) a clause such as that contained in section 6501(e)(1)(A)(ii), but chose not to do so, which suggests that Congress did not mean section 6501(e)(1)(A)(ii) to apply to section 6501(e)(1)(B). We need not here decide the applicability of section 6501(e)(1)(A)(ii) to section 6501(e)(1)(B), for even if we were to adopt petitioners' interpretation of section 6501(e)(1)(B), LFG failed to meet the requirement of section 6501(e)(1)(A)(ii) that it disclose information adequate to apprise the Secretary of the nature and amount of income includable in its gross income under section 551(b).

LFG's return for its taxable year ended April 30, 1974, reported no income includable in gross income under section 551(b), but did include a Form 3646 (Income from Controlled Foreign Corporation) in which it disclosed its interest in Simarloo, and disclosed that Simarloo realized during its taxable year ended June 30, 1973, foreign base company income from the sale of Dairy Farm/Hong Kong Land shares. LFG's return also contained a statement discussing Simarloo's background, its acquisition of Dairy Farm shares, the amount of profit from the sale of the shares, and LFG's reason for believing that such profits were exempt from inclusion in LFG's gross income under subpart F. LFG's return failed to disclose the amount of Simarloo's gross income for its taxable year ended June 30, 1973. Without such information, it was not possible for respondent to determine whether or not Simarloo qualified as a foreign personal holding company under section 552 or to calculate the amount of the section 551(b) deemed dividend that LFG should have reported.

In *University Country Club, Inc. v. Commissioner*, 64 T.C. 460, 471 (1975), we described the test for the application of section 6501(e)(1)(A)(ii) as follows: "The proper application of

---

[59] The statute of limitations as to original transferees is extended by 1 year, thus allowing respondent 7 years to assert liabilities against the transferees of LFG. Sec. 6901(b)(1).

the rule is whether an adjustment might be apparent from the face of the return to the elusive 'reasonable man.'"

In *George Edward Quick Trust v. Commissioner*, 54 T.C. 1336, 1347 (1970), affd. 444 F.2d 90 (8th Cir. 1971), we stated that nothing in section 6501(e)(1)(A)(ii) requires disclosure of the exact amount of omitted income, but concluded that "the touchstone in cases of this type is whether respondent has been furnished with a 'clue' to the existence of the error."

LFG's return disclosed to respondent that Simarloo had some foreign personal holding company income. For purposes of determining whether Simarloo was a foreign personal holding company, this information was of no use to respondent without information concerning Simarloo's gross income. LFG's return thus failed to provide respondent with a clue that Simarloo was a foreign personal holding company at all, let alone with a clue to the amount of its foreign personal holding company income. We therefore hold that LFG failed to meet the requirements of section 6501(e)(1)(A)(ii). It follows that respondent's assessments of liabilities against the transferees of LFG are not time barred.

*Decisions will be entered under Rule 155.*